OPINION
WILLIAM M. BARKER, J.,
delivered the opinion of the court,
in which FRANK F. DROWOTA, III, C.J, and E. RILEY ANDERSON and JANICE M. HOLDER, JJ., joined. ADOLPHO A. BIRCH, Jr., J. filed a concurring and dissenting opinion.
A jury convicted the defendant, Steven Ray Thacker, of first degree murder. Following a capital sentencing hearing, the jury found two aggravating circumstances: (1) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant; and (2) the murder was knowingly committed by the defendant while the defendant had a substantial role in committing, or was fleeing after having a substantial role in committing, a first degree murder, rape, robbery, burglary, theft or kidnapping. Tenn.Code Ann. § 39-13-204(i)(6), (7) (1997). The jury also found that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. Accordingly, the jury imposed a sentence of death. The Court of Criminal Appeals affirmed both the conviction and sentence.
Upon automatic appeal pursuant to Tennessee Code Annotated section 39-13-206 (2003) this Court entered an order specifying five issues for oral argument,[1] including (1) whether the evidence is sufficient to support the conviction; (2) whether the trial court erred in limiting the testimony of Dr. Keith Caruso, a forensic psychiatrist, at the sentencing hearing; (3) whether the trial court committed reversible error when it refused to instruct on the defendant’s “history of abuse and neglect” as a non-statutory mitigating circumstance; (4) whether the State improperly relied upon aggravating circumstance (i)(6) to support the death penalty; and (5) whether the death sentence is comparatively proportionate and valid under the mandatory review provisions of Tennessee Code Annotated section 39-13-206(c)(l)(A)-(D) (2003). After a careful *214 review of the record and relevant legal authority, we affirm the judgment of the Court of Criminal Appeals..
I. Background
A. Guilt Phase
The defendant, Steven Ray Thacker, was convicted of first degree premeditated murder and felony murder for the death of Ray Patterson.[2] The State’s proof at trial established that on January 2, 2000, an automobile being driven by the defendant broke down just east of the Mississippi River as he was traveling from Springfield, Missouri towards Dyersburg, Tennessee. The defendant received a ride from an unidentified male to the Northside Truck Stop in Dyersburg. The defendant asked the cashier at the truck stop, Melissa At-keson, if she knew of a wrecker service that was open on Sundays. Atkeson provided the defendant with the name and telephone number of Ray Patterson, a local wrecker operator. The defendant called Patterson and then waited at the truck stop until the wrecker arrived.
Elizabeth Patterson, the victim’s wife, remembered her husband receiving a telephone call at home on the morning of January 2, 2000. After taking the call, Patterson wrote “Oldsmobile Cutlass, '85, pull to Auto Zone store” on an envelope, then told his wife to continue on to church with their children and he would join them later if possible. When the victim left home that morning, he carried a .25 caliber semiautomatic pistol in his pocket, which, according to Ms. Patterson, was not unusual for her husband to do when answering calls for a wrecker. He also carried a pocket knife, his wallet, money, and a pack of cigars.
Curtis Hinson, an employee of Triple-A Taxi in Dyersburg, saw the victim and another man in the victim’s wrecker that morning. As Mr. Hinson was traveling on Lake Road, the victim’s wrecker passed by, traveling in the opposite direction. Hinson observed that the victim was driving, another man was riding as a passenger, and the wrecker was towing a vehicle. Also that morning, a maintenance worker at the Dyersburg welcome center, Thomas Burns, saw the victim accompanied by another man at the welcome center. Later that afternoon, Burns learned that Mr. Patterson had been killed, and he saw the defendant’s picture in the newspaper. Burns recognized the defendant as the same man he had seen with Mr. Patterson at the welcome center that morning.
Wyman Brasfield, a wrecker driver for Brasfield Body Shop, passed by Patterson Brothers’ Service Station during the morning of January 2, 2000 and noticed the victim standing inside the building with his back to the window. Brasfield also noticed another person, whom he could not identify, standing inside the building with the victim. The victim’s wrecker, with a car attached to it, was parked outside on the station lot. Later that day, Mr. Brasfield received a call to tow a vehicle at the residence of Tim Capps, a local mechanic. Upon arriving at Capps’ residence, Bras-field recognized the vehicle to be towed as the same one that had been hooked to the Patterson wrecker earlier in the day. The defendant later admitted to police that he had traded vehicles at Mr. Capps’ repair shop on that day.
Kenneth Campbell and Emily Guinn had been on their way to church the morning of January 2, 2000, when they stopped at Patterson Brothers’ Service Station to buy a drink. Wfiien Mr. Campbell got out of his vehicle he noticed a person walking towards him but thought nothing of it. *215 However, as he was attempting to get a soda from the drink machine, he saw the victim lying on the ground between the gas pumps and the office. Mr. Campbell immediately got back into his vehicle and left to find a telephone and call the police. He circled the block and, as he neared the service station again, he noticed “someone dragging the body near the roll-up door of the gas station.” Mr. Campbell then drove directly to the police station to report what he had seen.
Tina Canada, the manager of B & B Market at Big Boy Junction in Dyersburg, recalled that on that same Sunday morning, a man came into the store to purchase antifreeze. The man asked an elderly gentleman in the store, Sam Brown, whether there was an outside water faucet. He also asked Mr. Brown for directions to Auto Zone and then left the store, heading back toward town. According to Ms. Canada, the man was calm and “just concerned about getting his car fixed.” She could not, however, identify the defendant as being the man in the store.
At approximately 12:20 p.m. that day, the defendant entered the Auto Zone in Dyersburg and approached a customer in the store, Mr. Paul Gage. The defendant asked Mr. Gage if he knew of “a place to get a car worked on.” Mr. Gage referred him to Tim Capps and told the defendant that Capps’ repair shop was located behind Webb’s Used Cars. The defendant, in a statement later given to police, described how he drove from Auto Zone to Capps’ shop. When he was informed that it would take several days to repair his vehicle, the defendant traded his vehicle to Capps for a red Chevrolet Camaro. However, the Camaro had mechanical problems, so the defendant returned it in exchange for a Pontiac 6000.
By this time, police had discovered the victim’s body at Patterson Brothers’ Service Station and had begun their investigation. Officer David Fisher of the Dy-ersburg Police Department was the first officer on the scene. Officer Fisher discovered the victim lying in the first service bay of the service station. A trail of blood led from the first fuel pump island directly to the body. According to Officer Fisher, the victim was dressed in an “ordinary service-station-type uniform” and “his inner shirt was torn, and the jacket and shirt, around the collar area, was pulled backwards, as if he’d been dragged to the location that he was found.” Officer Fisher also observed a “substantial” wound to the victim’s upper torso.
Two EMT’s with the Dyersburg Fire Department, Jerry Walker and Ronnie Collins, arrived at the scene shortly thereafter. Mr. Walker examined the victim for vital signs but found none. Upon opening the victim’s shirt, he observed a wound “in his shoulder, coming down, it looked like. It looked like a knife wound.” No other wounds were discovered by Walker. A paramedic at the scene, Tony Douglas, also examined the victim and discovered “a puncture wound on the right side of the chest somewhere around two to three inches long and in a moon-shape.” Mr. Douglas believed that this wound was fatal and that the victim had died from “bleeding out” because “he’d lost a lot of blood.” He found no other wounds on the victim. Mr. Douglas admitted, however, that he did not know for certain the cause of death.
Investigator Jim Joyner was the first detective to arrive at the service station. He observed a very large amount of blood at the scene, recalling that “blood was all over the station, out in the front, in the service bay, in the office” and the victim’s clothing was “saturated with blood.” Additionally, there was a large blood spatter from the cash register to the wall of the *216 office. Investigator Joyner stated that the blood trail went out the door of the office toward the service bay door. A Discover credit card in the name of Forrest R. Boyd was found on the counter next to the credit card machine. Neither the victim’s gun nor his wallet were found, and the Patterson wrecker was missing from the service station.
Following up on the Discover credit card found at the scene of the crime, investigators contacted the Sheriffs Department in Polk County, Missouri. They were able to verify that the person who owned the card, Forrest Boyd, was a resident of Polk County and was not in Dyer County, Tennessee. Also, Boyd had not given permission for anyone to possess or use his card in Dyer County. Polk County Sheriff Mike Parson advised the Tennessee investigators that the defendant, Steven Ray Thacker, may have been in possession of the credit card and also Mr. Boyd’s vehicle, which Sheriff Parson described as a “1985 Oldsmobile Cutlass, burgundy in col- or” bearing the license plate number 540JBJ.
After receiving this information pointing to the defendant as a possible suspect, along with a description of the vehicle he might be driving, Investigator Joyner advised other area law enforcement personnel to be on the lookout for the vehicle and the defendant. Later that same day, the Dyer County Sheriffs Department was informed by Tim Capps that the suspect had traded vehicles and was possibly driving a cream colored 1984 Pontiac 6000. The Union City Police Department subsequently located both the vehicle and the suspect at the Super 8 Motel in Union City.
Derrick O’Dell, a patrol officer with the Union City Police Department, responded to information that the suspect vehicle was at the Super 8 Motel. Upon arriving at the motel, Officer O’Dell observed a white male exiting the building carrying two Wal-Mart bags and walking towards a dumpster. Officer O’Dell approached and questioned the man, who identified himself as “George” and stated that he was from Florida. When a second officer arrived, however, the man was identified as the defendant, Steven Thacker. The officers then transported the defendant to the Obion County Jail.
Investigator Joyner, along with Investigator Monty Essary, searched the defendant’s room at the Super 8 Motel pursuant to a warrant. They recovered several items belonging to the victim, including credit cards, a .25 caliber semiautomatic pistol, hair dye, and numerous other items. On the bed, the officers discovered two knives. Also, a green Carhartt coat and a brown coat were seized from the room and sent to the Tennessee Bureau of Investigation (TBI) for analysis. Some of the items found in the room were bloodstained.
Investigator Essary accompanied the victim’s body to the Methodist Hospital morgue, where he removed the victim’s clothing, including two bloodstained shirts. This clothing was bagged and sent to the TBI Crime Lab for analysis along with a blood sample obtained from the defendant. In addition, investigators located a red Pontiac Firebird at Tim Capps’ business that was one of the vehicles the defendant had driven. Inside the Pontiac, investigators found a Buck brand five-and-one-half-ineh knife with blood on it. This knife was also forwarded to the TBI Crime Lab. The Crime Lab report subsequently revealed that the DNA obtained from the blood on the victim’s shirt matched the DNA from blood found on the knife, the Carhartt coat, and the defendant’s boots, which had also been recovered from his hotel room by investigators.
The defendant was taken from the Obion County Jail to the Dyersburg Police *217 Department where, upon being advised of his rights, he voluntarily provided a statement to authorities. In his statement, the defendant detailed his actions leading up to and following the victim’s death.
The defendant related how he had left his home in Chouteau, Oklahoma, on about December 28, 1999, and traveled to Springfield, Missouri. He left Springfield on December 31 and traveled toward Dy-ersburg, Tennessee, but his car broke down “two-and-a-half miles this side of the Mississippi River.” An unidentified man gave the defendant a ride into Dyersburg and dropped him off at a truck stop. While at this truck stop, the defendant called the victim and asked him to tow his vehicle into the service station. Once they arrived back at the victim’s service station, the defendant attempted to pay the victim with the stolen credit card, but the card was rejected. According to the defendant, “he wasn’t gonna give my credit — my card back ‘cause I couldn’t pay the bill.... And I knew I was wanted in other states, so I just stabbed him and took off.” He explained that the victim had been facing the credit card machine when the defendant stabbed him but immediately turned around and attempted to pull out his gun. However, the defendant managed to elude him by hiding behind a truck parked inside the garage. The victim then ran out into the parking lot towards the tow truck and collapsed on the ground. At that point, the defendant drove the wrecker off the property and into some nearby woods so he could remove his vehicle from the back of the wrecker. The defendant then returned to the service station, dragged the victim’s body back into the building and took the victim’s wallet and gun.
The defendant explained how he later traded the Oldsmobile Cutlass that he was originally driving for a red Camaro, but that the Camaro had mechanical problems so he returned it in exchange for the Pontiac 6000. The defendant said that the knife he had used to stab the victim was probably in either the Oldsmobile or the Camaro. Shortly after the murder, the defendant went to a local Wendy’s restaurant for a sandwich and then drove to Union City where he checked into the Super 8 Motel. The defendant stated that his plan had been to go camping in the Smoky Mountains, and he admitted to having stolen some camping gear and the knife from Mr. Boyd along with the Oldsmobile.
Based upon the foregoing, the jury found the defendant guilty of first degree premeditated murder and felony murder in perpetration of a theft.
B. Penalty Phase
During the penalty phase of the trial, Polk County Missouri Sheriff Mike Parson testified that on January 2, 2000, there were warrants outstanding for the arrest of the defendant. Jim Porter, a criminal investigator with the Dyersburg Police Department, recounted how the defendant had stated during questioning that he “knew [he] was wanted in other states, so [he] just stabbed [the victim] and took off.”
Elizabeth Patterson, the victim’s widow, stated that she and the victim had been married for thirty-five years at the time of his death and that the couple had three adult children. Mrs. Patterson explained that her husband was her sole source of financial support prior to his death. Since his death she had had no income, and was forced to borrow money to pay burial expenses. She had also needed to borrow money to support herself until she received insurance proceeds. She stated, “I lost my best friend and companion. And I can’t sleep at night in my bed. I sleep on my couch.” She described her husband as “a good man ... a good Christian man,” *218 and related how her husband would sometimes tow vehicles for free. Mrs. Patterson also stated that her husband earned approximately $15,000 per year at the service station and that she had received $250,000 from her husband’s life insurance policy.
In mitigation, the defendant offered the testimony of Kimberly Bowen, a resident of Huntington, West Virginia, who lived with the defendant from 1994 until 1997. She described the defendant as follows:
Steve made me laugh a lot. He was very, very tender with me and my kids. Probably the best example would be when he went into construction and would be gone for a week or two at a time, he would plant notes throughout the house, ‘cause he knew that I’d go into the bill drawer to pay bills one day and there’d be a little note letting me know that he missed me, or, you know, in the laundry room. It didn’t really matter, you know, just little spots that he would have little notes to remind me of him.’
She further described the defendant as selfless and related how he had once aided flood victims in Milton, West Virginia. Ms. Bowen stated that it seemed like the defendant was always “seeking approval.” However, she also described periods during which the defendant’s behavior changed. According to Bowen, “maybe twenty percent of the time [the defendant] would get revved up and be — he wouldn’t be Steve.” She recounted how this behavior gradually affected their relationship to the point where she thought they needed to seek help in order to stay together. Thereafter, Ms. Bowen and the defendant went to a mental health facility in Huntington, West Virginia, where the defendant was diagnosed as having bipolar disorder and was prescribed lithium.
Ms. Bowen stated that the medication appeared to work. She recalled, however, one episode of manic behavior by the defendant occurring after he forgot to take his medication while on a trip out of town. According to Ms. Bowen, the defendant “ended up in Columbus, trying to get back, and he kept missing the turnoff on the Columbus loop ... and he kept going faster and faster. Every time he missed the turnoff, he was going faster. Finally, they stopped him at 140 miles an hour.” Ms. Bowen adamantly denied that the defendant used alcohol or illegal drugs or that he ever exhibited any violent behavior. When asked about the murder in Tennessee, Ms. Bowen stated that it was not the act of the Steve Thacker she knew and described it as “[s]o polar opposite. It’s frightening.”
On cross-examination, Ms. Bowen admitted telling an investigator that the defendant suffered severe mood swings. She explained that the defendant had periods of depression during which he would “get revved up” and exhibit manic behavior. She associated these periods of depression or “revving” as accompanied by spending sprees and “the need for sex.” During his “highs,” however, the defendant would seek approval from others. Bowen further stated that, at some point, the defendant voluntarily stopped taking his medication. Their relationship eventually ended because, according to Ms. Bowen, “it was a wear on me to always be ... the stable, you know, home base, if you will. I always felt like I was somehow responsible for Steve’s ability or inability to act correctly within society.”
Also testifying for the defendant was Crystal St. Clair, a resident of Huntington, West Virginia, who first met the defendant in 1993. Mrs. St. Clair said that the defendant was one of her best friends and described him as “a caring, giving person.” *219 She added that “he basically got along with most anyone” and that the defendant would “try to keep trouble down rather than create trouble.” Mrs. St. Clair thought highly enough of the defendant to trust him with her children. She acknowledged that when the defendant left West Virginia in 1997, she lost contact with him, although they would “periodically touch base with each other.” Mrs. St. Clair also admitted that she was aware of the defendant’s bipolar disorder, as well as his decision to stop taking his medication.
Roxanne Evans, the defendant’s paternal aunt, also testified for the defendant. She testified that the defendant’s father had been in the Air Force and was transferred to Spain when the defendant was two years old. When the defendant was four years old, his parents separated and eventually divorced, and his father gained custody of the defendant and his two sisters. The defendant’s father later remarried, but his new wife had difficulty dealing with the children. Ms. Evans said that on one occasion the children’s new stepmother “literally packed their clothes, sat them on the porch, and when my brother came home from work, told him that either the children left, or she left.” The defendant and his siblings were taken by their father to them grandparents’ home. From that point on, the defendant developed and maintained a close relationship with his grandfather, but he had little contact with his mother.
Ms. Evans recalled that as a child the defendant was quiet and introverted. She added that the defendant was very “affectionate” and that he seemed “hungry for acceptance, hungry for attention.” When asked if she had ever seen the defendant exhibit any violent behavior, Ms. Evans answered, “no.” She concluded by stating:
He’s a very loving and caring person. He has a problem, and I believe that in a controlled situation that he could live a semi-productive life, and I believe that somehow God could use his talents. He’s an extremely gifted artist. I believe that God could use his talents maybe to touch someone somewhere, even if it is in a prison.
The defense then presented Dr. Keith Allen Caruso, a forensic psychiatrist. Dr. Caruso had interviewed the defendant on July 17, 2001 and had also reviewed documents relating to the defendant’s case. Based on the information he gathered, Dr. Caruso diagnosed the defendant with a “number of conditions” including bipolar disorder, commonly known as manic depression. Dr. Caruso described this condition as “a mood disorder where someone’s emotional state may cycle from depression, where someone’s sad ... very tired ... unable to sleep and may think about suicide.” Dr. Caruso explained that “from a depressive episode, they may cycle up to a manic or hypomanic episode where they’re very excitable, ... irritable, ... impulsive and not think through the consequences of their actions.” A person in this state would, according to Dr. Caruso, “have tremendous amounts of energy and feel very agitated.” Their mind would race and “jump from one thought to the next, to the next, to the next.” Dr. Caruso added that “someone may cycle between these episodes, and there may be periods, also, in between that they may return to normal functioning.”
Dr. Caruso related that the defendant had a history of alcohol dependence but had been in remission while in confinement. The defendant also had a history of drag abuse, but again, had been in remission since going through drug rehabilitation as a teenager. Dr. Caruso further stated that the defendant had a “personality disorder with borderline and antisocial traits.” The doctor described persons *220 with this condition as having “problems controlling their behavior and behaving in maladaptive ways.” He opined that the defendant’s thoughts “particularly around the time of the offense, were more affected by the bipolar disorder.” Dr. Caruso stated, “I think this crime was a convergence of many factors. I think that there are some things dating back to Mr. Thacker’s childhood that put him on the path that he wound up here today.”
Dr. Caruso testified that the defendant’s mental condition could be treated with a “mood-stabilizing medication like lithium.” He was also aware that the defendant had previously been prescribed lithium for his bipolar disorder but had voluntarily stopped taking the medication. According to Dr. Caruso, once the defendant stopped taking the medication he would become ill again, and the cycling of the mood disorder would continue. He concluded that the defendant had been suffering a hypomanic episode at the time of the crime and explained:
Well, I think that bipolar disorder is the severe mental disease. I think, in addition, there was extreme mental or emotional disturbance. In fact, there were a number of stressors, based on Mr. Thacker’s history of abandonment and rejection, would again provoke him into a state of extreme emotional disturbance, in addition to the underlying mental disorder that he has, in addition to the bipolar disorder.
Dr. Caruso further testified that approximately two percent of the United States’ population suffers from bipolar disorder. Approximately “two-thirds to three-quarters” of these persons who take mood-stabilizing medication are able to function normally in society. However, Dr. Caruso stated that a major problem with treating bipolar disorder is that the patients are noncompliant with the medication regimen. Dr. Caruso affirmed that the defendant had voluntarily stopped taking his medication because he did not like the effect it had on him.
In Dr. Caruso’s opinion, the defendant was competent to stand trial, and a defense of insanity could not be supported in this case. Further, Dr. Caruso stated that he “didn’t feel that there was anything here that prevented Mr. Thacker from forming the mens rea for the alleged offenses.”
The defendant’s inmate records from Riverbend Maximum Security Institution in Nashville were also introduced. These records revealed that the defendant had incurred no disciplinary reports during his two years at that facility awaiting trial.
Following deliberation, the jury found the following aggravating circumstances: (1) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant; and (2) the murder was knowingly committed by the defendant while the defendant had a substantial role in committing, or was fleeing after having a substantial role in committing, a first degree murder, rape, robbery, burglary, theft or kidnapping. See Tenn.Code Ann. § 39 — 13—204(i)(6), (7) (1997). The jury also found that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. Accordingly, the jury sentenced the defendant to death.
II. Analysis
A. Sufficiency of the Evidence
The defendant challenges the sufficiency of the convicting evidence, arguing that there is insufficient evidence as to the cause of the victim’s death, insufficient evidence of premeditation, and insufficient evidence that the murder was committed *221 during the perpetration of a felony.[3] We disagree.
The standard for an appellate court reviewing a sufficiency challenge is “whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” State v. Reid, 91 S.W.3d 247, 276 (Tenn.2002); see also Tenn. R.App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn.1999). Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict. See State v. Evans, 108 S.W.3d 231, 237 (Tenn.2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn.2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn.1982). On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. State v. Smith, 24 S.W.3d 274, 279 (Tenn.2000); see also Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599.
A verdict of guilt by the trier of fact resolves all conflicts in the evidence in favor of the prosecution’s theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn.1997). “Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence.” Evans, 108 S.W.3d at 236 (citing Bland, 958 S.W.2d at 659). Nor may this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. Evans, 108 S.W.3d at 236-37.

(1) Evidence as to cause of death

The defendant contends that there was no credible testimony, either lay or expert, establishing that the victim died as a result of the stabbing.
At trial, the State presented testimony of the two emergency medical technicians (EMTs) and the paramedic who were called to the scene of the crime. One EMT, Jerry Walker, testified that when he arrived at the service station, the victim had no vital signs and appeared to have suffered a wound to his right shoulder. He opined that the victim had died from a knife wound but admitted that he did not know for certain the cause of death. The second EMT, Ronnie Collins, described the knife wound as “a pretty deep gash” and stated that the victim was “soaked in his blood.” The paramedic, Tony Douglas, testified that he examined the body and found a moon-shaped puncture wound, two to three inches long, on the right side of the victim’s chest. Douglas said that as a paramedic, he would describe the wound as fatal and opined that the victim died from loss of blood, although he admitted that he did not know for certain the cause of death.
Direct expert testimony as to the cause of death is unnecessary. McCord v. State, 198 Tenn. 226, 278 S.W.2d 689, 690 (1955). Death may be presumed when the defendant’s act is proven, the wounds are *222 apparent, and there is no suggestion in the record that the deceased died from any cause other than that relied upon by the State. Id. at 690-91; Bryant v. State, 503 S.W.2d 955, 958 (Tenn.Crim.App.1973); Franklin v. State, 180 Tenn. 41, 171 S.W.2d 281, 282 (1943). A non-expert, after describing a wound, may express an opinion that it caused death. See Owens v. State, 202 Tenn. 679, 308 S.W.2d 423, 424 (1957).
The defendant admitted that he stabbed the victim. There is testimony of extensive bleeding as the result of a deep stab wound that was inflicted just before the victim died, and no evidence that the victim had sustained other injuries. EMT Walker and paramedic Douglas both opined that the stab wound had been fatal. This lay testimony is sufficient to sufficient to support the jury’s verdict that the victim died as the result of the stab wound inflicted by the defendant.

(2) Premeditated murder

The defendant also argues that the evidence fails to prove first degree premeditated murder. He contends that there was insufficient time for premeditation because the stabbing occurred immediately after the victim refused to return the stolen credit card to the defendant.
The defendant was convicted of first degree premeditated murder, defined as “[a] premeditated and intentional killing of another.” Tenn.Code Ann. § 39-13-202(a)(l) (1997). An act is premeditated if the act is “done after the exercise of reflection and judgment.” Id. at (d).
“Premeditation” means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.
Id. We have long recognized that premeditation may be proven by circumstantial evidence. See; e.g., State v. Bush, 942 S.W.2d 489, 501 (Tenn.1997); State v. Brown, 836 S.W.2d 530, 541 (Tenn.1992). Several circumstances may be considered indicative of premeditation, including: use of a deadly weapon on an unarmed individual; the particular cruelty of the killing; the defendant’s threats or declarations of intent to kill; the defendant’s procurement of a weapon; making preparations to conceal the crime before the crime is committed; destruction or secretion of evidence of the killing; and a defendant’s calmness immediately after the killing. State v. Davidson, 121 S.W.3d 600, 615 (Tenn.2003); Bland, 958 S.W.2d at 660. Also, the jury may infer premeditation based upon the establishment of a motive for the killing. State v. Sims, 45 S.W.3d 1, 8 (Tenn.2001).
In the present case, there was sufficient evidence from which the jury could infer premeditation. First, the defendant stated that when he attempted to pay for the wrecker service and the credit card was rejected, he stabbed the victim and left because he “knew [he] was wanted in other states.” From these facts the jury could easily and reasonably infer that the moment the credit card was rejected the defendant realized that it would not be long before law enforcement authorities were notified and he would be apprehended for his earlier crimes. This establishes a motive for the killing. The jury could infer that the defendant’s motive was to further elude capture by eliminating the victim as a witness. See Sims, 45 S.W.3d at 8 (establishment of a motive as ground for in *223 ferring premeditation). Further, the jury could reasonably conclude that the defendant exercised reflection and judgment in forming an intent to kill the victim as soon as the credit card was rejected, but prior to the actual act of killing. See TenmCode Ann. § 39-13-202(d) (1997) (act is premeditated if “done after the exercise of reflection and judgment”).
Additionally, the defendant’s actions after stabbing the victim show that the defendant acted with a cool and calculating demeanor. See Bland, 958 S.W.2d at 660 (“[c]almness immediately following a killing is evidence of a cool, dispassionate, premeditated murder”). Immediately after his attack on the victim, a witness observed the defendant walking in a normal fashion across the parking lot at the scene of the murder. Other witnesses who observed the defendant after the killing described him as behaving normally and calmly. Following the stabbing, the defendant drove the wrecker to a secluded location in order to remove his vehicle from the back of the wrecker. The defendant then returned to the service station, dragged the victim’s body out of sight and removed the victim’s gun, cash and credit cards. Afterward, the defendant ate a hamburger at a nearby restaurant, conversed with several persons at an Auto Zone store, then to a repair shop where he traded vehicles, and finally checked in to a motel room in Union City.
In sum, there is sufficient evidence of the defendant’s motive for the killing and the defendant’s conduct and demeanor after the murder to support the jury’s finding of premeditation.

(3) Felony murder

The defendant next argues that there is insufficient evidence to show that the murder was committed in the perpetration of, or during an attempt to perpetrate, a felony because the theft occurred after the murder and was therefore an “afterthought,” collateral to the killing.
Felony murder is “[a] killing of another committed in the perpetration of or attempt to perpetrate any ... theft.” Tenn. Code Ann. § 39-13-202(a)(2) (1997). No culpable mental state is required for a felony murder conviction except the intent to commit the underlying felony. See Id. at (b).
The felony murder rule applies when the killing is “done in pursuance of the unlawful act, and not collateral to it.” Farmer v. State, 201 Tenn. 107, 296 S.W.2d 879, 883 (1956). “The killing must have had an intimate relation and close connection with the felony ... and not be separate, distinct, and independent from it.” Id. (quoting Wharton on Homicide, § 126 (3rd ed.)). The killing “may precede, coincide with, or follow the felony and still be considered as occurring ‘in the perpetration of the felony offense, so long as there is a connection in time, place, and continuity of action.” State v. Buggs, 995 S.W.2d 102, 106 (Tenn.1999). Nevertheless, the “intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim.” Id. at 107. “[A] jury may reasonably infer from a defendant’s actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing.” Id. at 108.
In this case, there is sufficient evidence for a jury to infer that the defendant had the intent to commit the theft at the time of the murder. First, the jury could have rationally inferred that when the victim rejected the stolen credit card, the defendant formed an intent not only to kill the victim, but also to take the victim’s property. Second, immediately after the *224 murder, the defendant removed the victim’s wrecker from the crime scene to another location, removed his vehicle from the wrecker, and then quickly returned to the crime scene to hide the victim’s body and take his personal belongings. Each of these actions was intimately related to the killing, and this entire episode could be viewed as one continuous criminal transaction. Such reasonable inferences are sufficient to justify a finding that the defendant was guilty of felony murder.
B. Exclusion of Mitigation Evidence as Hearsay
The defendant contends that the trial court erred in ruling that testimony sought from two defense witnesses during the sentencing portion of the trial was inadmissible hearsay. The first instance involved Kim Bowen, who was prepared to testify regarding statements the defendant had made to her about his childhood. Defense counsel asked Ms. Bowen if the defendant had ever spoken to her about his childhood and “the way he was raised.” The prosecution objected, arguing that Bowen’s response to the question would be hearsay. Defense counsel argued that hearsay may be admitted during the penalty phase of a capital trial if it is being offered as mitigation evidence. The trial, court asked defense counsel whether the same information could not be elicited from another witness who had first-hand knowledge. Defense counsel agreed that it could. The trial court then responded, “Diet’s do that. [The State’s] objection is sustained.”
The prosecution next objected when defense counsel asked the defendant’s aunt, Roxanne Evans, whether the defendant’s parents were absent from the trial by their own choice. The State objected on the ground that any response would be hearsay, and the trial court sustained the objection. However, a short bench conference was then held out of hearing of the jury. After the conference, the trial court explained to the witness that she could not testify “about what somebody’s told you.” Defense counsel’s questioning was then allowed to resume, at which time, in the presence of the jury, Ms. Evans was asked:
Q: From what you’ve observed. Go ahead.
A: They have chosen not to be here.
Thus, the answer defense counsel sought to elicit from the witness was ultimately admitted. The defendant argues on appeal, however, that by the time the jury heard the answer to the original question, the interruptions caused by the prosecution and the trial court had negated its value. Further, the defendant claims that the trial court’s instructions to the witness left her unable to state why the defendant’s parents had chosen not to attend the trial.
Tennessee Code Annotated section 39-13-204(c) (1997) provides that, at a capital sentencing hearing, any evidence “which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted.” Therefore, any evidence relevant to the circumstances of the murder, the aggravating circumstances relied upon by the State, or the mitigating circumstances is admissible if such evidence has probative value in the determination of punishment. See State v. Teague, 897 S.W.2d 248, 250 (Tenn.1995).
Testimony concerning the defendant’s estranged relationship with his parents was relevant as mitigating evidence. Exclusion of such mitigating evi *225 dence “potentially undermines the reliability of the sentencing determination, and is an error of constitutional magnitude.” State v. Cauthern, 967 S.W.2d 726, 739 (Tenn.1998) (citing Skipper v. South Carolina, 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986)). The burden thus falls on the State to prove that any error in excluding mitigation evidence did not affect the verdict and was harmless beyond a reasonable doubt. Id. (citing Satterwhite v. Texas, 486 U.S. 249, 258, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).
A review of the record reveals that the essence of the excluded evidence was ultimately presented to the jury. Defense counsel agreed that the testimony sought from Kim Bowen could be obtained through other witnesses and, in fact, it was brought forth through the testimony of Roxanne Evans. Also, despite the defendant’s contentions that its value was lessened due to interruptions by the trial court, the jury was allowed to hear Ms. Evans’ statement that the defendant’s parents were not at the trial by their own choice. Furthermore, the reason for the parents’ absence would have served only as evidence of the strained relationship between the defendant and his parents, and this fact was already before the jury. Accordingly, we conclude that any error in excluding such mitigation evidence did not affect the jury’s verdict and was harmless beyond a reasonable doubt.
C. Prosecutorial Misconduct
The defendant next argues that the prosecution engaged in misconduct by improperly attempting to elicit testimony from witnesses regarding prior bad acts of the defendant. To prevail on such a claim, the defendant must show that there was an impropriety and that it “affected the verdict to the prejudice of the defendant.” State v. Chalmers, 28 S.W.3d 913, 917 (Tenn.2000); Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965). Factors to be considered include: (1) the conduct complained of viewed in light of the facts of the case and surrounding circumstances; (2) any curative measures undertaken by the trial court; (3) the intent of the prosecutor; (4) the cumulative effect of the conduct and any other errors in the record; and (5) the relative strength and weakness of the case. Chalmers, 28 S.W.3d at 917.
The defendant alleges two instances of misconduct by the prosecution. The first occurred during the guilt phase of the trial when, on direct examination, the prosecution asked Union City Police Officer Derrick O’Dell the following question:
Q: And did you question [the defendant] in any manner after he was under arrest?
A: Only after he made the statement that we did better than the Springfield Police Department.
The State did not pursue the issue further and quickly concluded the direct examination of the officer. However, during a brief bench conference, defense counsel objected, arguing that the prosecution was improperly eliciting testimony concerning the defendant’s prior bad acts. The trial court warned the prosecutor that such statements could potentially result in a mistrial being declared.
We conclude that the prosecutor’s posing of this question to the officer did not constitute prosecutorial misconduct. The officer’s answer simply was not responsive to the question. Although the officer’s answer possibly alerted the jury to the defendant’s criminal activity in another jurisdiction, the prosecutor’s question did not call for the officer to make any such reference. The record also shows that the *226 prosecutor was genuinely surprised by the officer’s remark. Furthermore, the defendant’s confession, in which he admitted to being wanted in other states, was later admitted into evidence and read to the jury. Therefore, any prejudice resulting from Officer O’Dell’s remark was harmless.
The second instance of alleged prosecutorial misconduct took place during the sentencing phase of the trial as the defendant’s aunt, Roxanne Evans, testified for the defense. During direct examination Ms. Evans had offered testimony regarding the defendant’s childhood and family life and had stated that as a child the defendant was quiet and introverted. She also testified that she had never seen the defendant exhibit any violent behavior. On cross-examination the prosecution asked Ms. Evans if she remembered an incident which had occurred while the defendant worked at an automobile detailing shop. Evans replied that she did remember the incident, and the following exchange took place:
Q(by the prosecution): What happened?
A(by Ms. Evans): I apologize if my memory seems a little fuzzy.... I do remember an incident that Steve took a car and drove to Florida, a car from the shop my brother worked at.
Q: Not your brother’s car; is that correct?
A: No, sir.
Q: Some customer’s car; is that correct?
A: I don’t know if it was a customer’s car, or if it was a lot car. I don’t know.
Q: And drove it to Florida; it that correct?
A: I believe so.
Q: And wrecked it?
The defense objected at this point on the ground that the prosecution was violating Tennessee Rule of Evidence 404(b) by attempting to introduce evidence of prior bad acts which reflected on the defendant’s character. In response, the State argued that Ms. Evans’ testimony on direct examination had already placed the defendant’s character in issue and therefore it was permissible under Tennessee Rule of Evidence 405 to cross-examine her regarding this prior act of the defendant.
Despite the State’s argument, the trial court initially sustained the defense objection and prepared to give a limiting instruction to the jury. However, the prosecutor quickly interjected and called the court’s attention to Tennessee Code Annotated section 39-13-204(c), which in a capital sentencing hearing permits the introduction of any evidence “which the court deems to have probative value on the issue of punishment ... regardless of its admissibility under the rules of evidence.” Tenn.Code Ann. § 39-13-204(c) (1997). The prosecution argued that testimony regarding the defendant taking the car to Florida had probative value because it served to rebut prior testimony by defense witnesses concerning the defendant’s character. After further consideration, the trial court agreed with the State’s argument, overruled defense counsel’s objection, and did not give a limiting instruction to the jury.
Ms. Evans’ testimony, quoted above, came on cross-examination and related an instance in which the defendant had taken a car without permission several years pri- or to the crime for which he was now on trial. It is also important to note that this testimony was given during the sentencing phase of the trial. Evidence is not excluded at a capital sentencing hearing merely because it is otherwise inadmissible under the Rules of Evidence. See Tenn.Code *227 Ann. § 39-13-204(c); State v. Stout, 46 S.W.3d 689, 702 (Tenn.2001). In a capital sentencing hearing, any evidence relevant to the circumstances of the murder or to the aggravating or mitigating circumstances is admissible in determining punishment if it has probative value. See Teague, 897 S.W.2d at 250. Further, due to the constitutional requirement that capital sentencing be conducted in an individualized manner, evidence regarding the defendant’s character and background is admissible regardless of its relevance to any aggravating or mitigating circumstances. Sims, 45 S.W.3d at 13. Nevertheless, a trial court has the discretion to exclude any evidence that would render the trial fundamentally unfair, or whose probative value is outweighed by its prejudicial effect. See Tenn. R. Evid. 403; State v. Burns, 979 S.W.2d 276, 282 (Tenn.1998).
Generally, Rule 404 prohibits the use of character evidence to prove action on a particular occasion in conformity with the character trait. See Tenn. R. Evid. 404. Rule 404(b) specifically serves to filter out evidence of prior bad acts if offered to infer conduct in conformity with a character trait; however, such evidence may be admissible for other purposes. Tenn. R. Evid. 404(b). In cases where character evidence is admissible, Tennessee Rule of Evidence 405 provides that “inquiry on cross-examination is allowable into relevant specific instances of conduct.” Tenn. R. Evid. 405(a). However, before inquiring into specific instances of conduct, the trial court must hold a hearing outside the presence of the jury and determine whether a factual basis for the inquiry exists and whether “the probative value of a specific instance of conduct on the character witness’s credibility outweighs its prejudicial effect on substantive issues.” Id.
In State v. Sims this Court analyzed the relationship between Rule 405 and Tennessee Code Annotated section 39-13-204(c), focusing on the precise issue of whether section 39-13-204(c) precluded application of Rule 405 during a capital sentencing hearing. 45 S.W.3d at 13. We concluded that section 39-13-204(c) provides trial judges with wider discretion than normally permitted under the Rules of Evidence and that trial judges are not required to strictly follow Rule 405 in determining whether the State should be allowed to question a defendant’s witness regarding the defendant’s prior convictions. Sims, 45 S.W.3d at 14. We have provided the following principles:
The Rules of Evidence should not be applied to preclude introduction of otherwise rehable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant. As our case history reveals, however, the discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim’s family. The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive and unwieldy in the arena of capital sentencing.
Id.; see also Stout, 46 S.W.3d at 703.
We also concluded that the issue should not be whether testimony is character evidence under Rules 404 and 405. Rather, *228 the proper focus in a capital sentencing hearing should be whether the testimony is relevant to the mitigating factors presented by the defendant and on the relevance of the defendant’s prior bad acts to refute those mitigating circumstances. Sims, 45 S.W.3d at 14. We further noted that when evidence of prior convictions is admitted in a capital sentencing hearing, the trial court should instruct the jury that the evidence is to be considered solely to rebut mitigating testimony related to the defendant’s character. Id at 15.
In Sims, the prosecution was allowed to cross-examine a witness regarding the defendant’s prior burglary and theft convictions in order to rebut mitigating evidence that the defendant was not by nature an aggressive person. Id at 14-15. Likewise, in State v. Stout, evidence of prior convictions for aggravated burglary, theft, reckless endangerment and robbery was allowed to rebut mitigation evidence that the defendant was a “fíne, active Christian.” 46 S.W.3d at 703.
In the present case, evidence of the defendant’s character had already been admitted when the prosecution cross-examined Ms. Evans. On direct examination, Ms. Evans testified that she had never seen any exhibitions of violent behavior by the defendant. She further described the defendant as “always very quiet” and “very affectionate.” There was also testimony from another mitigation witness, Crystal St. Clair, that the defendant “was a caring, giving person.... [H]e was the type of person that would try to keep trouble down rather than create trouble.”
These facts are similar to Sims and Stout in that evidence of the defendant’s prior non-violent property crime was sought to be introduced to rebut evidence that the defendant was not a violent person. Accordingly, we conclude that the testimony regarding the defendant’s act of taking a vehicle to Florida, although not a crime .of violence, was admissible to rebut mitigation testimony regarding the defendant’s character. The prosecutor, therefore, did not act improperly in seeking to admit this evidence. Although a limiting instruction should have been given to the jury in this instance, reversal for such an error is “limited to those exceptional cases in which the impeaching testimony is extremely damaging, the need for a limiting instruction is apparent, and the failure to give it results in substantial prejudice to the rights of the accused.” State v. Howell, 868 S.W.2d 238, 255 (Tenn.1993). The trial court’s error in this regard was harmless.
D. Limitation of Testimony by Dr. Caruso
Next, the defendant argues that the trial court erred during the sentencing hearing by preventing Dr. Keith Caruso, a forensic psychiatrist, from fully explaining the details of his diagnosis of the defendant’s mental condition.
Prior to Dr. Caruso’s testimony a jury-out hearing was held, during which the State expressed concern that Dr. Caruso’s opinion was based, in part, on the two prior murders the defendant had committed in Missouri and Oklahoma. Under Tennessee Rule of Evidence 705 an expert may testify “in terms of opinion or inference” without disclosing the “underlying facts or data” upon which the opinion is based. However, on cross-examination, the expert may be required to disclose those underlying facts or data. Tenn. R. Evid. 705. This rule allows the prosecution to impeach the expert’s diagnosis by inquiring into any of the defendant’s prior bad acts contained in reports relied on by the expert in evaluating the defendant. See State v. Hall, 958 S.W.2d 679, 712 (Tenn.1997). Any mention of the specific *229 nature of the defendant’s other crimes committed in Missouri and Oklahoma had been scrupulously avoided during trial. However, it became evident during the sentencing hearing that the State could rely upon Rule 705 to inquire about these other crimes if they were a basis for Dr. Caruso’s diagnosis and opinion. To avoid thus “opening the door” to introduction of these crimes, the trial court limited Dr. Caruso’s examination to evidence obtained from Kim Bowen, from the defendant’s former employer, and from medical records and childhood history.
While Tennessee Code Annotated section 39-13-204(e) (1997) permits great latitude in the introduction of evidence during the sentencing phase of a capital trial, the admissibility of evidence is ultimately entrusted to the sound discretion of the trial court. Reid, 91 S.W.3d at 305. Absent an abuse of that discretion, we will not reverse such rulings on appeal. Id. The trial court allowed Dr. Caruso to testify about the defendant’s bipolar disorder and substance abuse without being subjected to cross-examination regarding the defendant’s prior commission of murders in Missouri and Oklahoma. By doing so, the trial court avoided any potential prejudice that would have resulted from revealing the defendant’s prior crimes. Accordingly, we conclude that the trial court did not abuse its discretion in limiting Dr. Caruso’s testimony.
The defendant also argues that the trial court erred by interrupting Dr. Caruso’s testimony and thus distracting the jury from concentrating on his testimony. The interruption came while Dr. Caruso was giving a long explanation of the various factors that he believed led the defendant to commit the crime in this case. The trial judge stopped the testimony and called for a bench conference, where defense counsel was warned that Dr. Caruso’s testimony was non-responsive and rambling. Following the bench conference, Dr. Caruso’s examination resumed on a new topic. Upon reviewing the record, we conclude that the trial court’s actions did not reflect negatively on Dr. Caruso’s testimony. T-here is no indication that the court acted intentionally to weaken the doctor’s testimony. Rather, the trial court was exercising its discretion to curtail non-responsive answers and was actually protecting the defendant from Dr. Caruso’s possible inadvertent disclosure of the defendant’s other crimes.
E. “History of Abuse and Neglect” Mitigating Circumstance Instruction
The defendant complains that the trial court erred in failing to instruct the jury on the non-statutory mitigating circumstance of a “history of abuse and neglect.” The defendant argued at trial that the rejection and abandonment by his parents amounted to abuse and neglect and requested that the jury be instructed on this non-statutory mitigating circumstance. Concluding that there was no evidence the defendant had suffered abuse and neglect during his childhood, the trial court refused to give a specific jury instruction as to this mitigating circumstance. The trial court did, however, allow the defense to argue a history of abuse and neglect as a mitigating circumstance under the catchall provision of Tennessee Code Annotated section 39 — 13—204(j)(9) (1997). The trial court instructed the jury that, in addition to other specific mitigating circumstances, it should consider
any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing, that is, you shall consider any aspect of the defendant’s character or record, or any *230 aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.
We begin by noting that this Court has previously held that jury instructions on specific non-statutory mitigating circumstances are not constitutionally mandated. State v. Odom, 928 S.W.2d 18, 30 (Tenn.1996); State v. Hutchison, 898 S.W.2d 161, 174 (Tenn.1994). Therefore, the right to such instructions, as well as the form and content of the instructions, derives solely from the statute, which provides:
[T]he trial judge shall also include in the instructions for the jury to weigh and consider any mitigating circumstances raised by the evidence at either the guilt or sentencing hearing, or both, which shall include, but not be limited to, those circumstances set forth in subsection (j).
TenmCode Ann. § 39-13-204(e)(l) (1997). This statute further provides that:
a reviewing court shall not set aside a sentence of death or of imprisonment for life without the possibility of parole on the ground that the trial court did not specifically instruct the jury as to a requested mitigating factor that is not enumerated in subsection (j).
Id. In Odom, we interpreted this statute to require jury instructions on any circumstances raised by the evidence and proffered by a defendant as having mitigating value. 928 S.W.2d at 30. The instructions on non-statutory mitigating circumstances must not be fact-specific but must instead be “drafted so that when they are considered by the jury, the statutory mitigating circumstances are indistinguishable from the non-statutory mitigating circumstances.” Id. at 32.
Generally, in determining whether instructions are erroneous, this Court must review the charge in its entirety and read it as a whole. See State v. Hodges, 944 S.W.2d 346, 352 (Tenn.1997). A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law. Id.
The defendant presented evidence that his father did not interact with him and sent him and his siblings to live with their grandparents. However, there is no evidence of physical, sexual, or mental abuse or neglect. In fact, the defendant’s aunt testified that the defendant had a good relationship with his grandfather. The trial court determined that the fact that the defendant suffered from a history of abuse and neglect was not fairly raised by the evidence. We agree. Furthermore, any potential error in this respect was rendered harmless by the catchall instruction.
F. Mandatory Review Factors
When reviewing a sentence of death, we are required by statute to determine whether:
(A) The sentence of death was imposed in any arbitrary fashion;
(B) The evidence supports the jury’s finding of statutory aggravating circumstance or circumstances;
(C) The evidence supports the jury’s finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances;. and
(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.
Tenn.Code Ann. § 39-13-206(c)(l) (2003).

1. Aggravating and Mitigating Circumstances

The jury found the existence of two aggravating circumstances: (1) “[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a *231 lawful arrest or prosecution of the defendant or another” and (2) “[t]he murder was knowingly committed ... by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, [or] theft....” Tenn.Code Ann. § 39-13-204(i)(6), (7) (1997).
On appeal the defendant challenges the State’s reliance on the (i)(6) aggravating circumstance regarding murder committed for the purpose of avoiding arrest. He contends that the (i)(6) aggravating circumstance should apply only if the evidence showed that he killed Mr. Patterson in order to avoid arrest for the robbery of Mr. Patterson, rather than to avoid prosecution on unrelated charges from other jurisdictions. We disagree.
During the sentencing hearing, Sheriff Mike Parson testified that there were warrants outstanding for the arrest of the defendant in Polk County, Missouri as of the date of Mr. Patterson’s murder. The victim, Mr. Patterson, had no connection to these or any other charges pending against the defendant from other jurisdictions. However, the defendant was well aware that there were warrants outstanding for his arrest in other jurisdictions. Had the victim notified the authorities of the defendant’s use of the stolen credit card, an investigation would have ensued, and the defendant could have been arrested on these warrants. The defendant admitted that this possibility motivated the murder when he told police, “I knew I was wanted in other states, so I just stabbed him and took off.” This evidence supports application of the (i)(6) aggravating circumstance, as the jury could reasonably conclude that the defendant was motivated to murder the victim in order to prevent any investigation that could lead to the defendant’s arrest for these unrelated charges from other jurisdictions.
We have previously held that the State must prove that avoidance of prosecution or arrest was one of the purposes motivating the killing in order to apply the (i)(6) aggravating circumstance. See Terry v. State, 46 S.W.3d 147, 162 (Tenn.2001); Bush, 942 S.W.2d at 504. However, application of this aggravating circumstance is not limited to those situations where the crime sought to be avoided was directly related to the murder. Terry, 46 S.W.3d at 162; State v. Hall, 976 S.W.2d 121, 133 (Tenn.1998). Rather than looking for a connection between the crimes, “the focus must remain on the defendant’s motives for the murder.” Terry, 46 S.W.3d at 162.
The defendant in Terry was a pastor who embezzled money from his church over the course of several years. Id. at 151. Eventually, he began experiencing emotional problems and concocted a plan whereby he would stage his own death and begin a new life elsewhere under an assumed identity. Id. The defendant killed a handyman at the church, left his body in the attic, and then set fire to the church. Id. at 152. At trial, the jury found the defendant had committed the murder for the purpose of avoiding or preventing a lawful arrest or prosecution for the embezzlement of church funds, thus establishing the (i)(6) aggravating circumstance. Id. at 154, 157. The defendant argued that the (i)(6) aggravator did not apply because the murder victim was not the victim of the embezzlement, nor a witness to that crime, nor even a law enforcement officer attempting to arrest the defendant for that crime. Id. at 162. Nevertheless, this Court upheld the defendant’s sentence of death upon concluding that there was evidence “from which a reasonable jury could find that the defendant committed the *232 murder, at least in part, to prevent his apprehension for the theft.” Id. at 162. We reasoned that the jury could conclude that “because of [the defendant’s] desire to avoid arrest or prosecution for his theft, he decided, at least in part, to commit murder and leave behind a body, charred beyond all recognition, to prevent any investigation that would have inevitably occurred had he merely ‘disappeared.’ ” Id. at 163. Like the defendant in Terry, the defendant in the present case killed in order to prevent an investigation that could have ultimately resulted in his arrest for prior, unrelated crimes.
We further conclude that the evidence supports the application of the (i)(7) aggravating circumstance, which requires that “[t]he murder was knowingly committed ... by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, [or] theft....” Tenn.Code Ann. § 39 — 13—204(i)(7) ,(1997). As discussed previously, the killing was committed during the perpetration of a theft. The evidence shows that upon stabbing the victim, the defendant stole the victim’s gun, cash and credit cards. The defendant also took the victim’s wrecker and drove it to another location so that he could remove his vehicle from the back of the wrecker. This evidence is sufficient to support the jury’s finding that the (i)(7) aggravating factor was proven beyond a reasonable doubt.
In determining whether the evidence supports the application of an aggravating circumstance, the proper standard to consider is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. State v. Henderson, 24 S.W.3d 307, 313 (Tenn.2000) (citing State v. Carter, 988 S.W.2d 145, 150 (Tenn.1999)). After a careful review of the testimony and evidence presented at the sentencing hearing, we conclude that the evidence fully supports the jury’s findings that the (i)(6) and (i)(7) aggravating circumstances had been established beyond a reasonable doubt.
We also conclude that the evidence supports the jury’s finding that the two aggravating circumstances outweighed the various mitigating circumstances beyond a reasonable doubt. The primary mitigation evidence was that the defendant suffered from bipolar disorder and that his relationship with his parents was dysfunctional. However, to the extent that his mental Alness played a role in the killing, the expert testimony from Dr. Caruso showed that it did not prevent the defendant from knowing what he was doing, forming the requisite mens rea, or understanding the wrongfulness of his actions. The evidence supports the jury’s determination.

2. Comparative Proportionality Review

In cases where a defendant has been sentenced to death, we are required to conduct a comparative proportionality review pursuant to Tennessee Code Annotated section 39-13-206(c)(l)(D) (1997). Comparative proportionality review seeks to ensure that the death penalty is applied consistently and not arbitrarily or capriciously. Terry, 46 S.W.3d at 163. Our analysis is intended to determine whether the defendant’s sentence of death “is disproportionate to the sentences imposed for similar crimes and similar defendants.” Bland, 958 S.W.2d at 664.
In undertaking this analysis, we apply the precedent-seeking method of *233 comparative proportionality review, in which we compare the present case with other cases involving similar defendants and similar crimes. See Bland, 958 S.W.2d at 664. We examine the facts and circumstances of the crime, the defendant’s characteristics, and the aggravating and mitigating factors involved. Id. Because no two defendants or crimes are identical, we cannot limit our comparison to those cases where a defendant’s death sentence is “perfectly symmetrical.” Id. at 665. Rather, we seek only to “identify and invalidate the aberrant death sentence.” Id. A sentence of death is disproportionate when “the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.” Id. at 668.
The pool of eases we consider in a comparative proportionality review includes those first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment without possibility of parole, or death. State v. Godsey, 60 S.W.3d 759, 783 (Tenn.2001); Bland, 958 S.W.2d at 666. Several nonexclusive factors are relevant to identifying and comparing similar cases: (1) the means of death; (2) the manner of death, such as whether the death was violent or torturous; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims’ circumstances including age, physical and mental conditions, and the victims’ treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. Terry, 46 S.W.3d at 164; see also State v. Henderson, 24 S.W.3d 307, 316 (Tenn.2000). Also, we have identified several nonexclusive factors relevant to comparing the defendant’s characteristics, including: (1) the defendant’s prior criminal record or prior criminal activity; (2) the defendant’s age, race, and gender; (3) the defendant’s mental, emotional or physical condition; (4) the defendant’s involvement or role in the murder; (5) the defendant’s cooperation with authorities; (6) the defendant’s remorse; (7) the defendant’s knowledge of helplessness of victim(s); (8) the defendant’s capacity for rehabilitation. Terry, 46 S.W.3d at 164; Henderson 24 S.W.3d at 316.
The proof in this case showed that the defendant’s vehicle broke down and was towed to a service station by the victim. The defendant then attempted to pay for the wrecker service with a stolen credit card. When the card was rejected, the defendant stabbed the victim because the defendant “knew [he] was wanted in other states.” The defendant then proceeded to drive the wrecker off the property so that he could remove his car. He then returned to the service station where he attempted to conceal the victim’s body and stole the victim’s gun, cash and credit cards.
In mitigation, proof was presented through testimony from Dr. Caruso that the defendant suffered from bipolar disorder and that persons with this illness may be very excitable, irritable, very impulsive, may have tremendous amounts of energy, and may feel very agitated. Dr. Caruso also testified that the defendant has a personality disorder with borderline and antisocial traits and that the defendant was suffering from extreme mental or emotional disturbance at the time of this crime. Proof was also presented regarding the defendant’s childhood. His parents divorced when he was young, and he and his sisters were sent to live with their grandparents.
We conclude that the defendant’s sentence of death in this case was not applied *234 arbitrarily and was not excessive or disproportionate when compared to similar cases in which the same penalty was imposed. We have upheld the death penalty in several similar cases where the defendant stole from the victims and committed murder to avoid arrest or prosecution. See State v. Powers, 101 S.W.3d 383 (Tenn.2003) (after abducting, robbing, and shooting his victim, the defendant was sentenced to death based on the aggravating circumstances that he had prior violent felony convictions, he committed the murder to avoid arrest and prosecution, and he committed the murder while committing robbery and kidnapping); State v. Reid, 91 S.W.3d 247 (Tenn.2002) (defendant sentenced to death for shooting two restaurant employees during the course of a robbery, based on the aggravating circumstances that the murders were committed during a robbery and to avoid arrest, and that the defendant had prior violent felony convictions); State v. Hall, 976 S.W.2d 121 (Tenn.1998) (after shooting victims and stealing their automobile, defendant was sentenced to death based upon aggravating circumstances that the murders were committed to avoid arrest and prosecution, the murders were committed during the commission of a theft, the murders were committed during escape, and the defendant had prior violent felony conviction); State v. Bush, 942 S.W.2d 489 (Tenn.1997) (defendant stabbed burglary victim and was sentenced to death based on the aggravating circumstances that the murder was committed to avoid arrest and prosecution and that the murder was heinous, atrocious or cruel); State v. Carter, 714 S.W.2d 241 (Tenn.1986) (after abducting his victim, shooting him to death, and stealing his truck, defendant was sentenced to death based on the aggravating circumstances that he committed the murder to avoid arrest and prosecution and committed the murder while committing larceny and kidnapping); State v. Melson, 638 S.W.2d 342 (Tenn.1982) (defendant beat victim to death with hammer because she discovered that he had committed a theft; defendant sentenced to death based on aggravating circumstances that the murder was heinous, atrocious or cruel and that the murder was committed for the purpose of avoiding arrest and prosecution).
We have also upheld the death penalty in cases involving defendants who introduced mitigating circumstances substantially similar to those presented by the present defendant. For example, we have affirmed the sentence of death for defendants who experienced a troubled childhood and suffered from emotional problems. See State v. Pike, 978 S.W.2d 904 (Tenn.1998) (death penalty imposed on finding of (i)(6) aggravating circumstance, despite evidence of troubled childhood and personality disorders); Bush, 942 S.W.2d at 493 (imposing death penalty upon finding the (i)(5) and (i)(6) aggravating circumstances, despite substantial evidence of defendant’s troubled childhood and mental problems); State v. Hines, 919 S.W.2d 573 (Tenn.1995) (imposing death penalty upon finding the (i)(2), (i)(5) and (i)(7) aggravating circumstances despite evidence that the defendant had a troubled childhood, was abandoned by his parents, and suffered from self-destructive behavior and personality disorder); State v. Smith, 868 S.W.2d 561 (Tenn.1993) (imposing death penalty upon finding the (i)(5), (i)(6), (i)(7), and (i)(12) aggravating circumstances despite mitigation evidence that defendant had been hospitalized for depression and paranoid personality disorder).
While no two capital cases are identical, we have compared the circumstances of the present case and the present defendant with the circumstances of the cases set out above and those individual defendants, and conclude that this case is not plainly lacking in circumstances consistent *235 with other similar cases in which the death penalty has been imposed. Thus, the defendant’s sentence of death is not disproportionate considering the circumstances of the crime and the defendant.
III. Conclusion
After considering the entire record in this case we conclude that all of defendant’s assignments of error are without merit. Furthermore, we find that the sentence of death was not imposed arbitrarily, that the sentence of death is not excessive or disproportionate, and that the evidence supports the jury’s finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. With respect to issues not specifically addressed within this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are published hereafter as an appendix. The defendant’s convictions and sentences are affirmed. The sentence of death shall be carried out as provided by law on the 8th day of September, 2005, unless otherwise ordered by this Court or other proper authority.
It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.
ADOLPHO A. BIRCH, Jr., J., filed a concurring and dissenting opinion.
APPENDIX
(Excerpts from the Court of Criminal Appeals’ Decision)
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 8, 2003 Session
STATE OF TENNESSEE v. STEVEN RAY THACKER
Direct Appeal from the Circuit Courts for Dyer and Lake Counties Dyer County
No. COO-54; Lake County No. 01-CR-8238 R. Lee Moore, Jr., Judge.
No. W2002-01119-CCA-R3-DD — Filed December 18, 2003.
[Deleted: Introductory Paragraph]
Tenn. R.App. P. 3; Judgment of the Criminal Court Affirmed.
John Everett Williams, J., delivered the opinion of the court, in which Gary R. Wade, P.J., and Robert W. Wedemeyer, J., joined.
Charles S. Kelly, Sr., and Wayne Emmons, Dyersburg, Tennessee, for the appellant, Steven Ray Thacker.
Paul G. Summers, Attorney General and Reporter; Gill R. Geldreich, Assistant Attorney General; C. Phillip Bivens, District Attorney General, and Karen Burns, Assistant District Attorney General, for the appellee, State of Tennessee.
JOHN EVERETT WILLIAMS, JUDGE.
OPINION
[Deleted: Factual Background]
I. CHANGE OF VENUE
On August 9, 2000, the defendant filed a motion for a change of venue based on grounds that the widespread pre-trial publicity in Dyer County and contiguous counties had resulted in undue excitement against the defendant that would prejudice a fair trial on the merits. A hearing on the motion was conducted on August 25, 2000. At the hearing, Rachel Jacobs, an investigator with Inquisitor, Inc., testified that she researched the various sources of media in the area and obtained packets from the Commercial Appeal, the Dyers- *236 burg News, the State Gazette, and the Tennessean newspapers, as well as from newspapers in Springfield, Missouri, and Tulsa, Oklahoma. The collection of articles was extensive and was submitted as evidence. Ms. Jacobs’s research of the video media from Memphis area television stations revealed that sixty-nine separate segments on this subject had been aired from the date of the defendant’s arrest until July 18, 2000, the day preceding her testimony.
Ms. Jacobs stated that she and another investigator from Inquisitor conducted a random survey in Dyer County concerning the population’s exposure to the defendant’s case. Thirty-two persons were polled, and of the thirty-two, approximately two-thirds had knowledge about the case. Of the thirty-two people, forty-two percent stated that they did not believe that Mr. Thacker could receive a fair trial in Dyer County.
Ms. Jacobs performed a similar study in neighboring Lake County. Ms. Jacobs discovered that the residents of Lake County received information from basically the same media sources as residents of Dyer County. Ms. Jacobs admitted on cross-examination that she did not conduct a poll of Lake County residents.
At the conclusion of the hearing, the trial court entered the following findings, in relevant part:
[Ujnder the circumstances, where both sides feel like a change of venue is appropriate ... it would be somewhat amiss for me not to grant a change of venue. So, I think the way we’re deal [sic] with that is this: Your motion, as far as the change of venue, will be granted in that the Court will follow the Rules of Criminal Procedure first, which would mean a change of venue to Lake County. I will allow you ... if you feel like that’s something that will — that you need to introduce some additional proof on at a later time, we will allow you to do so.... Again, it’s not something that’s written in concrete at this point. I’m not convinced — I don’t know that we have evidence that would indicate that a jury pool out of Lake County would be tainted. I don’t know for sure whether or not we will be better having the trial in Lake County or the trial with a Lake County [jury] here.... I’ll just have to take that under advisement.... I don’t think the publicity has been such that we cannot seat an impartial jury from Lake County, Lauderdale County, or Gibson County, and I’d want to talk to the judges down there about how we would do that, if we did it. So, the process that will be followed will be taken under advisement, but we will have a change of venue....
The trial court then ordered that venue was to be changed to Lake County.
On May 15, 2001, the trial court revisited the “change of venue” issue. The defendant presented Leigh Anne Hudgings, an investigator with Inquisitor, Inc., to testify regarding her study as to whether the Lake County jury pool was tainted. Ms. Hudgings conducted a random sampling of ninety-seven Lake County residents. The results of the survey reflected that over half of the people surveyed, 51.1%, had prior knowledge of the crime. Of the 51.1%, 46%, or one out of every four persons surveyed, had already formed opinions of the case. On cross-examination, Ms. Hudgings admitted that she did not attempt to determine whether or not those persons polled were actually qualified to sit on a jury panel.
Evan Jones, editor and publisher of the Lake County Banner, testified on behalf of the State. Mr. Jones stated that the Lake County Banner provided weekly news to *237 the residents of Lake County. He added that Lake County television markets were generally WPSD in Paducah, Kentucky, and the station in Cape Girardeau. Mr. Jones explained that while Dyer County followed the Memphis television stations, Lake and Obion County watch the Padu-cah and Cape Girardeau stations. He added that KMIS, a Missouri radio station, broadcasts Lake County football games.
With regard to the defendant’s case, Mr. Jones testified that the Lake County Banner had only printed two stories about Steven Thacker in the past calendar year. One story ran January 5, 2000; the other on August 30, 2000. Both stories ran on the front page.
After hearing argument from counsel, the trial court made the following findings:
I don’t think ... that there is sufficient proof that would indicate that we cannot seat a jury that can be fair and impartial from Lake County residents. Again, the worse case scenario is that one out of four has either formed or expressed an opinion. We can pull a big enough jury pool, I think, where we can seat twelve men or women who have not formed or — expressed or formed any opinion as to guilt or innocence in this case, and can have a trial from which the jury can find that issue solely and alone from the evidence that’s introduced, and from the law that’s charged by the Court. So, your motion will be denied ....
The defendant now complains that the trial court “erred grievously in his assessment and understanding of the evidence introduced by [the defendant] at this hearing.” He contends that “no matter if you do pull a ‘big enough jury pool,’ still, according to statistical survey, there will still be one out of four Lake Countians who believe the defendant is guilty!” The defendant states that “the refusal of the ... trial court to grant the proper change of venue has deprived [him] of a fair trial by an impartial jury of his peers.”
The decision of whether to grant a motion for a change of venue based on pretrial publicity rests within the sound discretion of the trial court and will not be reversed on appeal absent a clear abuse of discretion. State v. Howell, 868 S.W.2d 238, 249 (Tenn.1993). Furthermore, the defendant must show that the jurors were biased or prejudiced against him before his conviction will be overturned on appeal. State v. Melson, 638 S.W.2d 342, 360-61 (Tenn.1982). The defendant contends that the trial court failed to determine whether “a fair trial probably could not be had” as required by Rule 21(a), Tennessee Rules of Criminal Procedure, which provides:
In all criminal prosecutions the venue may be changed upon motion of the defendant, or upon the court’s own motion with the consent of the defendant, if it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had.
(Emphasis added); see also Tenn.Code Ann. § 2(Mr-201(l) (stating venue “may be changed ... upon good cause shown”) (emphasis added). Rule 21 further provides:
In a multi-county judicial circuit a change of venue shall be to the nearest county in the judicial circuit in which the prosecution is pending where the same cause for change of venue does not exist. If the same cause for change of venue exists in all other counties in the judicial circuit, the venue shall be changed to *238 the nearest county where the same cause for change of venue does not exist.
Tenn. R.Crim. P. 21(c).
Jurors need not be totally ignorant of the facts and issues involved in a case upon which they are sitting, but they must be able to lay aside their opinions or impressions and render a verdict based upon the evidence presented. State v. Bates, 804 S.W.2d 868, 877 (Tenn.1991). Mere exposure to news accounts of the incident does not, standing alone, establish bias or prejudice. State v. Crenshaw, 64 S.W.3d 374, 386 (Tenn.Crim.App.2001). The test is “whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity.” State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn.Crim.App.1989). The burden of proof is on the defendant. Id.; State v. Garland, 617 S.W.2d 176, 187 (Tenn.Crim.App.1981).
The defendant, in addition to citing to numerous newspaper articles and television segments, described as “extremely sensational, attention-grabbing words and pictures,” asserts that the short amount of time the jury deliberated at both the guilt and penalty phases was “unconscionable” and indicative that the jurors were tainted by pretrial publicity, “whether they were clearly aware of it or not.” However, the defendant has not cited any authority in support of his contention that the brevity of the jury’s deliberations indicated prejudice or caprice. Anglin v. State, 553 S.W.2d 616, 620-21 (Tenn.Crim.App.1977), cert. denied, (Tenn. June 6, 1977), states that brevity of the time of deliberation does not indicate passion, prejudice, caprice, or misconduct on the part of the jury. Guided by Anglin, we reject the defendant’s contention that the short amount of time the jury deliberated is proof of being tainted by pretrial publicity.
The record reveals that the defendant used only four of his sixteen peremptory challenges. It has been generally recognized as a rule in this state that the failure to challenge for cause or the failure to use any available peremptory challenge to remove objectionable jurors precludes reliance upon the alleged disqualifications of jurors on appeal. See Adams v. State, 563 S.W.2d 804, 807 (Tenn.Crim.App.1978), cert. denied, (Tenn. Apr. 10, 1978) (citing Sommerville v. State, 521 S.W.2d 792 (Tenn.1975)). Moreover, despite his argument that the extensive and “sensational” coverage by the media denied him a fair trial, the defendant has failed to direct this Court to any specific portion of the record, in particular the voir dire examination of the jurors, indicating the biased character of the jurors actually selected. One who is reasonably suspected of murder cannot expect to remain anonymous. With consideration of the defendant’s failure to exhaust all peremptory challenges, the careful supervision of voir dire by the trial court, and the assertion by the jurors that they could and would give the defendant a fair and impartial trial, we cannot conclude that the trial court abused its discretion in removing the case to Lake County. This claim is without merit.
II. REDACTED STATEMENT OF DEFENDANT
Prior to the testimony of State’s witness Jim Porter, the prosecution discussed the manner in which the defendant’s confession would be introduced and the problems with redacted portions of the statement. A typed transcript was used, and the trial court permitted, over defense objection, copies of the transcript to be passed to jurors to read along with Investigator Porter. The trial court observed that the record needed to reflect that there is a “recorded statement ... written statement that we have [that] has been redacted to *239 take out any reference to any crime other than this particular Ray Patterson crime.” It was understood that the redacted portion of the statement would not be read to the jury.
The defendant now complains that Investigator Porter was improperly permitted to read into evidence the following redacted portions of Thacker’s statement:
DEFENDANT: And after he ran the credit card number through, — he got through and pretty much know what happened from there.
PORTER: Well, I want you to tell me.
DEFENDANT: Well, he wasn’t gonna give my credit — my card back ‘cause I couldn’t pay the bill’.
PORTER: Okay.
DEFENDANT: And I knew I was wanted in other states, so I just stabbed him and took off.
[[Image here]]
PORTER: Camping? Okay. Okay, where did you get this Oldsmobile Cutlass, Steve?
DEFENDANT: From Boyd. That was his Cutlass.
PORTER: You take anything from that house — his house?
DEFENDANT: Just some camping gear, and that’s where the knife came from that I stabbed Patterson with.
(Emphasis added.) The defendant submits that “the error of the trial [cjourt in allowing the improperly redacted statement to be read in open [cjourt to the jury, and the prosecutorial misconduct of the District Attorney General in presenting and eliciting the harmful testimony from Investigator Porter, constitute harmful, reversible error.” The defendant further complains that the prosecution’s use of these statements during closing argument also constitutes reversible error. In this regard, the defendant maintains that the use of these statements are in contravention of Rule 404(b), Tennessee Rules of Evidence.
The State initially responds by asserting that any objection thereto is waived for failure to enter a contemporaneous objection to the introduction of the statements. See Tenn. R.App. P. 36(a). The defendant’s failure to raise a contemporaneous objection to this testimony as being a prior bad act effectively waives this issue. See, e.g., State v. Thompson, 36 S.W.3d 102, 108 (Tenn.Crim.App.2000), perm. to appeal denied (Tenn. Mar. 17, 2000); State v. Adkisson, 899 S.W.2d 626, 635 (Tenn.Crim.App.1994). Notwithstanding waiver, we elect to address the issue on its merit.
As a general proposition, evidence of a defendant’s prior crimes, wrongs, or acts is not admissible to prove that he committed the crime in question. Tenn. R. Evid. 404. The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. State v. Rickman, 876 S.W.2d 824, 828 (Tenn.1994). The risk is greater when the defendant’s prior bad acts are similar to the crime for which the defendant is on trial. Id.; see also State v. McCary, 922 S.W.2d 511, 514 (Tenn.1996). While such evidence usually does not come in the form of statements or confessions made by the defendant, there exists no valid reason to make an exception to the requirements for prior bad act evidence disclosed in a defendant’s confession.
Evidence of a defendant’s prior crimes, wrongs or acts may be admissible where it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). Thus, evidence of a *240 criminal defendant’s character may become admissible when it logically tends to prove material issues which fall into one of three categories: (1) the use of “motive and common scheme or plan” to establish identity, (2) to establish the defendant’s intent in committing the offense on trial, and (3) to “rebut a claim of mistake or accident if asserted as a defense.” McCary, 922 S.W.2d at 514. In order for such evidence to be admitted, the rule specifies three prerequisites:
(1) The court upon request must hold a hearing outside the jury’s presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.
Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court find by clear and convincing evidence that the defendant committed the other crime. Tenn. R. Evid. 404, Advisory Comm’n Comment; State v. DuBose, 953 S.W.2d 649, 654 (Tenn.1997); State v. Parton, 694 S.W.2d 299, 303 (Tenn.1985).
In reviewing a trial court’s decision to admit or exclude evidence, an appellate court may disturb the lower court’s ruling only if there has been an abuse of discretion. DuBose, 953 S.W.2d at 652; State v. Baker, 785 S.W.2d 132, 134 (Tenn.Crim.App.1990). Where the trial court has been called to pass upon the admissibility of evidence of other crimes, wrongs, or acts under Rule 404(b), its determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b). See DuBose, 953 S.W.2d at 652.
In the present case, we first acknowledge that the trial court was unable to conduct a jury-out hearing due to the defendant’s failure to object. Notwithstanding, we are cognizant that the trial court stated that the confession had been redacted to take out any reference to any crime other than the instant offense.
A “And I knew I was wanted in other states, so I stabbed him. ”
This statement is relevant to explain the defendant’s motive for the murder of the victim and that the murder was committed premeditatively. The statement that he was wanted in other states did not reveal the nature of the offenses for which he was wanted. Moreover, the statement proved a relevant non-character purpose, i.e., his motive, for stabbing the victim with the requisite mental state. Motive is a relevant circumstantial fact that refers to why a defendant did what he did. Evidence of motive is often pertinent as the basis to infer that the act was committed, to prove requisite mental state, or to prove the identity of the actor. See 22 C. Wright & K. Graham, Jr., Federal Practice and Procedure Evidence § at 479 (1978). Indeed, the defendant’s possession of a motive strengthens the inference that the death of the victim was caused by an intentional act rather than by a natural accident. There is sufficient evidence to show that the defendant’s “wanted” status was relevant to show motive and that motive was a relevant noncharacter purpose in this case. The State did not seek its introduction for propensity purposés. Finally, in making a risk versus benefit analysis in this case, we cannot conclude that the prejudicial impact of the statement outweighed its probative value. Accordingly, the admission of the statement was not error nor was the fact *241 that the prosecutor referred to the admission during closing argument.

B. Statements Made In Reference to Boyd’s Oldsmobile Cutlass

During his confession, the defendant responded that he got the Oldsmobile Cutlass from Boyd and that he had taken camping equipment from Boyd’s house. We cannot conclude that this statement is evidence of prior bad acts. There is no reference to any theft on behalf of the defendant, and there is no reference to the murder of Forrest Boyd. Accordingly, there was no error in the admission of the statement referring to property taken from Forrest Boyd. Any claim that the admission or reference to this statement was error is without merit.
III. TESTIMONY OF SHERIFF PARSON
Prior to Sheriff Mike Parson of Polk County, Missouri, taking the stand, the defense objected and the following colloquy occurred:
MR. STRAWN: ... We believe that the information that’s going to be elicited from him has already been elicited from other witnesses. We think the danger of the jury being tainted with a potential crime that occurred in another state is too great.
THE COURT: What’s the purpose of this witness?
GENERAL BIVENS: Your Honor. He is the one who advised them that Mr. Thacker — he is the one who advised them that Mr. Thacker was a suspect when he was called about the credit card, and that Thacker would be in the car. He described the car to them and gave them the license number. I’ll be glad to lead him, Your Honor, and I have cautioned him I’m only going to ask him about the fact that Forrest Boyd was not in Tennessee on January 2nd, that Mr. Thacker was thought to be in possession — was a suspect to be in possession of Mr. Boyd’s credit card and car, and that he gave them a description of the car and the license number. I’m not going to touch anything else with him.
THE COURT: Can’t we simply — y’all are not in a position where you can stipulate that?
MR. KELLY: It’s already in the record that it’s Forrest Boyd’s card laying there by the machine. It’s already been testified to.
GENERAL BIVENS: That’s why I don’t see any prejudice in it, Your Honor. It establishes how they had that information.
MR. KELLY: What it’s going to get in is, it’s going to get in an unconvicted prior bad act of a theft in Missouri, without question. You know, it’s not for any other purpose.
GENERAL BIVENS: Your Honor, it goes to the question of premeditation. He knew that he was over here in somebody else’s car and with somebody else’s credit card, and when that credit card was used, he knew it was gonna come back as stolen.
MR. KELLY: That’s already in the record.
THE COURT: No, that’s not in the record. The only thing that’s in the record is that he used a credit card that’s Forrest Boyd’s.
MR. KELLY: Unauthorized—
GENERAL BIVENS: No, sir, there’s nothing in the record on that point. That’s what we have to establish through him, that he was not authorized to have Forrest Boyd’s credit card, and the only way we can establish that—
*242 THE COURT: How can he do that?
GENERAL BIVENS: He actually knows. Your Honor, that Forrest Boyd was dead at that point, and he actually knows about the homicide. They were aware of the homicide.
MR. STRAWN: You see how great the danger is here?
GENERAL BIVENS: But I’m not going to that point, Your Honor, but he had knowledge that the credit card was stolen.
[[Image here]]
GENERAL BIVENS: It goes to his premeditation.
THE COURT: — but it does go the issue of premeditation. All right, I’m going to let you put it in, but be careful, now. Being careful goes — it’s a two-edged sword. It goes both ways. You could get the wrong information and end it on a mistrial here.
[[Image here]]
THE COURT: And by the same token, if you solicit the information—
MR. STRAWN: Your Honor, we almost can’t even cross him, because it’s so dangerous.... And I think it’s too dangerous. It’s going to get in a pri- or — an unconvicted prior bad act.
THE COURT: That’s why I’m asking you why you can’t stipulate that he had or was in possession of a Forrest Boyd credit card, and he was unauthorized to use it?
MR. KELLY: We can.
THE COURT: You can? Then what else do you need him for?
GENERAL BIVENS: Your Honor, they were told that — he told the description of the vehicle and the license plate number. That’s the main thing. If they want to stipulate that he had Forrest Boyd’s car and credit card and was unauthorized—
MR. KELLY: What’s his car got to do — identity is not an issue.
GENERAL BIVENS: Still, Your Hon- or, it goes to the premeditation and flight. That’s the car that was towed here.
THE COURT: I don’t know that you have to get the car into it.
GENERAL BIVENS: That’s the car that was towed in, Your Honor. Otherwise, the jury is going to have the impression, Your Honor, that he had this car over here and—
MR. STRAWN: It’s the credit card that he’s saying goes to premeditation. We’re stipulating that’s unauthorized.
GENERAL BIVENS: No, sir, it’s the car and the credit card. He knew he was wanted because of that, Your Honor.
[[Image here]]
GENERAL BIVENS: The question is premeditation, Your Honor. The question is Thacker knew he was wanted, knew that he was and that’s why he did this. That’s in his statement, Your Honor, just the statement that he knew he was wanted is in his confession, not for what, but that he knew he was wanted, and that’s why he did it.
THE COURT: All right, I’m going to allow him to testify. Now, be careful.
Sheriff Mike Parson testified, during the guilt phase, that Forrest Boyd was a resident of Polk County, Missouri, on January 2, 2000. He further stated that he advised Dyer County law enforcement that Mr. Boyd was not in Dyer County and that anyone who had his credit card or vehicle in Dyer County would have been unauthorized. Sheriff Parson related a description of Mr. Boyd’s vehicle, including providing *243 the license plate number. The Sheriff added that a person by the name of Steven Ray Thacker may be in possession of both the credit card and the vehicle.
Sheriff Parson testified again at the sentencing phase. Sheriff Parson stated that on January 2, 2000, there were outstanding warrants for the arrest of Steven Ray Thacker in Polk County, Missouri. He added that he believed that Steven Ray Thacker left the state of Missouri in Forrest Boyd’s vehicle.
The defendant complains that the trial court erred by admitting the testimony of Sheriff Parson. The defendant asserts that (1) the trial court failed to conduct a jury out hearing as required by Rule 404(b), Tennessee Rules of Evidence; (2) the defense agreed to stipulate to the fact that the defendant was in possession of Forrest Boyd’s credit card and was unauthorized to use it; and (8) the prejudicial effect of the Sheriffs testimony outweighed any probative effect it may have had. In support of these contentions, the defendant states that the testimony of Sheriff Parson was neither relevant nor necessary, because it was already in the record that the credit card of Forrest Boyd was lying beside the cash register in the Patterson service station. From this, he contends, the jurors could infer that the credit card was stolen. The State responds that the evidence was necessary to show motive and, therefore, relevant to the issue of premeditation.
The general parameters regarding admissibility of a defendant’s bad acts other than the crime on trial is found in Tennessee Rule of Evidence 404(b). As stated previously, evidence of prior crimes, wrongs, or acts is generally inadmissible as character evidence of the defendant to prove that he committed the crime in question. Tenn. R. Evid. 404(b).
As the defense argues, the defendant’s identity was not at issue. Rather, the only issue in this matter was the degree of homicide, the defendant’s state-of-mind. Rule 404(b) provides that evidence of other crimes, wrongs, or acts may be admissible for purposes other than to prove the character of a defendant, only if certain conditions are met:
(1) The court upon request must hold a hearing outside the jury’s presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
(8) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.
First, we note that the trial court was required to hold a hearing on the admissibility of Rule 404(b) evidence only upon request (emphasis added). The defendant failed to request a 404(b) hearing. Thus, the trial court did not err by failing to conduct a hearing. Technically, it is waived. State v. Jones, 15 S.W.3d 880, 895 (Tenn.Crim.App.1999).
Next, the State sought to introduce evidence (1) that Forrest Boyd was not in Dyer County, Tennessee, on January 2, 2000; (2) that the defendant’s possession of Forrest Boyd’s credit card was unauthorized; and (3) a description of the vehicle. This evidence was relevant to establish premeditation. While evidence had already been introduced that Forrest Boyd’s credit card was found at the scene of the murder, no evidence was before the jury at that time that the defendant’s possession of the credit card was unauthorized. Similarly, there was no other evidence establishing the fact that the defendant’s use of Mr. Boyd’s vehicle was unauthorized. Thus, Sheriff Parson’s testimony was high *244 ly relevant in establishing the defendant’s motive for the murder.
Finally, we conclude that the evidence was more probative than prejudicial. The State’s examination of Sheriff Parson and Sheriff Parson’s responses were restricted to very vague inquiries as to the presence of Forrest Boyd in Dyer County and whether the use of his credit card and/or car in Dyer County were authorized. No information was elicited regarding the murder of Forrest Boyd. Indeed, there is no indication from the testimony that Forrest Boyd is deceased. Additionally, the prosecution was careful to not elicit the term “theft,” “steal,” or an equivalent term from Sheriff Parson. Therefore, for the reasons stated, we conclude that the testimony of Sheriff Parson did not invoke error.
[Deleted: IV. PROOF OF DEATH BY LAY TESTIMONY]
V. PROSECUTOR’S COMMENTS DURING CLOSING ARGUMENT
During closing argument, the prosecutor made the following comment:
And Mr. Kelly says he’s sorry. Where’s the evidence that he’s sorry? Is dragging Ray Patterson’s body across the parking lot of that service station into that bay, is that showing I’m sorry? Is taking this dead man’s wallet, pistol, credit cards, showing I’m sorry, I’m sorry? Does taking this wrecker out and getting his car off and then coming back into town and getting other means of escape show I’m sorry, I’m sorry? When he sees Jim Porter in AutoZone, does he go up and say, “Officer, I’m sorry. In a fit of passion, I killed a man. I’m sorry.” No. He tries to cover up his crime. He trades cars. He leaves town. He makes an escape route at the motel where he goes. He dyes his hair so he won’t look the same. Now, is that somebody who is sorry, or is that somebody who has planned and cold-bloodedly, premeditatedly killed somebody?
The defendant moved for a mistrial based upon the prosecutor’s comment to the jury that they had heard nothing remorseful from any witnesses and that the comment was an improper comment regarding the defendant’s failure to testify. The State responded that “Mr. Kelly made the argument in his closing that the defendant was remorseful and sorry. My comment was that there was no evidence of remorse or sorrow.” The trial court denied the defendant’s motion. The defendant now complains that this was error.
Where a defendant complains of a prosecutor’s closing argument, he is required to show that the argument was so inflammatory or the conduct so improper that it affected the verdict to his detriment. Harrington v. State, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965). A prosecutor is strictly prohibited from commenting on the defendant’s decision not to testify. State v. Reid, 91 S.W.3d 247, 297 (Tenn.2002); Coker v. State, 911 S.W.2d 357, 368 (Tenn.Crim.App.1995). However, we do not conclude that the statements made by the prosecutor constitute a comment on the defendant’s failure to testify. During closing argument, counsel for the defendant remarked:
I am very sorry that Mr. Patterson is deceased. I knew Mr. Patterson, I know his family, and I’m very sorry this happened. And so is my client. By we can’t undo that. And you’re not to use — the Court’s gonna tell you you’re not to use sympathy in deciding what the appropriate offense is that Mr. Thacker committed.
*245 The statements made by the prosecution were rebuttal argument directed to the defense counsel’s earlier argument that the defendant was sorry about the murder. The gist of the prosecutor’s comments was directed more toward the defendant’s actions and omissions after the killing, rather than the defendant’s failure to testify. We do not think the statement can be fairly characterized as a comment on the defendant’s failure to testify. See generally State v. Miller, 771 S.W.2d 401, 405 (Tenn.1989). Thus, there was no error committed by the trial court in refusing to grant a motion for mistrial on this basis.
VI. FAILURE TO PERMIT ARGUMENT & INSTRUCTION ON SELF-DEFENSE
During a jury instruction conference pri- or to closing arguments at the guilt phase, the trial court inquired as to a charge of “self-defense.” The prosecution objected stating:
[I]t has to be raised by the proof. It can’t be strictly an argument. There has to be some proof of self-defense, and there is absolutely nothing in this testimony or proof that indicates self-defense, Your Honor.
Counsel for the defendant responded:
There’s evidence of a firearm on the victim, Your Honor, and evidence that it was loaded. I just think that raises enough of an inference for us to argue it.
The trial court concluded that there was no proof that the victim had ever “pulled” his weapon on the defendant and the charge was not provided.
To determine whether self-defense is fairly raised by the proof and must be instructed to the jury, “a court must, in effect, consider the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence.” State v. Shropshire, 874 S.W.2d 634, 639 (Tenn.Crim.App.1993). A person is justified in using force against another person when he or she reasonably believes (1) that death or serious bodily injury is imminent, and (2) that the force used is immediately necessary to protect against the other person’s use or attempted use of unlawful force. Tenn.Code Ann. § 39-ll-611(a). On the other hand, a person is not justified in using or threatening force against another if he or she provoked the other person’s use or attempted use of unlawful force unless (1) he or she “abandons the encounter or clearly communicates to the other the intent to do so,” and (2) the other person still persists in using unlawful force. Tenn.Code Ann. § 39-11-611(d)(1) — (2). A defendant who seeks to avoid criminal responsibility for his conduct upon a theory of self-defense must be free from fault in bringing about the necessity of using force or should have clearly abandoned his initial intent to do harm. See State v. Dereke Emont Fitzgerald, No. W2000-01279-CCA-R3-CD, 2000 WL 1671456 (Tenn.Crim.App. at Jackson, Oct. 24, 2000).
Even considering the evidence in the light most favorable to the defendant, we cannot conclude that the evidence raised a factual issue as to whether the defendant acted in self-defense. Although several witnesses testified that the victim carried a weapon, there was no evidence that the victim was the aggressor who pulled his gun on the defendant. According to the defendant, the victim tried to pull his gun out only after Thacker had stabbed him. Moreover, Thacker admitted that he stabbed the victim as the victim was facing toward the credit card machine with his back toward him. There is simply no objective basis for us to find that the defendant reasonably believed that he was in imminent danger of death or serious bodily injury. Accordingly, the refusal to in *246 struct the jury on self-defense was not error.
[Deleted: VII. SUFFICIENCY OF THE EVIDENCE]
VIII. SUPPRESSION OF DEFENDANT’S CONFESSION
On March 22, 2000, the defendant filed a motion to suppress or determine the admissibility of his confession made to law enforcement officials.[1] A hearing on the motion was held on August 25, 2000. At the hearing, the State presented Officer Tack Simmons. Officer Simmons related the events immediately preceding the defendant’s arrest at the Super 8 Motel in Union City. Specifically relating to the defendant’s initial arrest, Officer Simmons stated that, after detaining the defendant, Officer Simmons inquired as to the defendant’s name. The defendant replied, “Steve Patterson.” Recalling that the victim’s name was Patterson, Officer Simmons surmised that Patterson was not the defendant’s true identity. At this time, the defendant was placed in handcuffs. While the defendant was being placed in Officer O’Dell’s patrol car, Officer Simmons advised him of his rights. The defendant indicated that he understood his rights. Officer O’Dell then transported the defendant to the county jail. O’Dell stated the distance to the Obion County Jail was approximately “a mile and a quarter.” On the way to the jail, the defendant
made a spontaneous utterance that we did better than the Springfield police. I asked him what he was talking about. He said that — To quote him, what I have in my notes, ‘You did a better job than Springfield. They walked by me for four days while I hid in the woods.” And I ask[sic] why they were looking for him, and Mr. Thacker stated who was looking for him. Mr. Thacker stated “the police.” I asked why they were looking for him. Mr. Thacker stated, “Because it was a stolen car.” I asked him if the victim of the stolen car was still with us, meaning ... was she still alive. Mr. Thacker stated, ‘Yeah, she made it. She jumped out of the car, leaving the kid, and got away.” Then he stated, “I didn’t hurt the kid. I dropped the kid and grandmother off at a relative’s house, and the police started chasing me from there.” And that was the end of our conversation.
Officer O’Dell testified that, during the trip to the jail, the defendant was “very calm” and did not exhibit any strange behavior. Officer O’Dell verified that the defendant had indicated to Officer Simmons that he understood his rights. The defendant did not ask for counsel during this time. Dyersburg Police Officer Terry Ledbetter, along with Captain Dudley, transported the defendant from the Obion County Jail to the Dyersburg Police Department. Nothing was said to the defendant on the way to Dyersburg other than a general inquiry as to whether the defendant had a cold. The defendant was turned over to Investigator Jim Porter upon arriving at the Police Department.
Investigator Porter stated that he escorted the defendant to an interrogation room. No written advisement or waiver of rights was used; rather, Investigator Porter recorded both the advisement of rights and the defendant’s subsequent statement. Investigator Porter recalled that the defendant appeared to understand what he was saying and did not appear to be under *247 the influence of drugs or alcohol. Porter proceeded to advise the defendant of his rights and that he was going to be charged with first degree murder. He continued to inquire as to whether the defendant understood his rights and whether he “wanted to talk ... about it.” The defendant responded that he wished to give a statement. Relating the specific circumstances of the interrogation, Porter recalled that the defendant was only in the interrogation room for approximately two minutes prior to the interview commencing, the defendant was offered and accepted a cigarette, and the interview lasted approximately fifteen to twenty minutes. At no time was the defendant advised that if he provided a statement, “things would go a lot better for him.” During the interview, the defendant admitted that he killed the victim. The defendant also stated how and why he killed the victim. Investigator Porter testified that throughout the defendant’s statement, the defendant remained “calm and collected.”
At the conclusion of the hearing, the defense advised the court that the defendant would be having a mental evaluation the following day and that this evaluation might provide evidence of mental disease or disturbance. Notwithstanding, the trial court opted to rule upon the evidence before it and found:
[W]ith the evidence that’s before the Court on the Motion to Suppress, the Court will overrule the Motion to Suppress, the statement of Mr. Thacker given to Officer, excuse me, to Investigator Porter. There just simply is nothing there to — as a basis at this point for the Court to suppress any such statement. It appears that from the evidence before the Court at the present time that the defendant was advised of his rights by Officer Simmons and by Officer Porter....
The defendant asserts that the trial court erred when it denied his motion to suppress his confession. Specifically, the defendant asserts that his “alleged confession, given soon after his arrest to Investigator Jim Porter, should have been suppressed, in view of the testimony of Dr. Keith Caruso that he suffered from a severe mental illness — bipolar disorder — and a severe mental disturbance on the date the crime was committed, January 2, 2000.” The defendant argues that “it is clear from the evidence that he was not mentally capable of making a decision concerning giving a statement or not giving a statement and about waiving his constitutional rights to counsel.” Additionally, the defendant asserts that he was without counsel in an oppressive, coercive, police-dominated atmosphere at the Dyersburg Police Department. He concludes that his mental disturbance, coupled with the coercive police atmosphere, rendered his confession involuntary.
We review the trial court’s denial of the defendant’s motion to suppress by the following well-established standard:
Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court’s findings, those findings shall be upheld. In other words, a trial court’s findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn.1996). However, the trial court’s application of law to *248 the facts, as a matter of law, is reviewed de novo, with no presumption of correctness. State v. Daniel, 12 S.W.3d 420, 423 (Tenn.2000). This court may consider the proof at trial, as well as at the suppression hearing, when considering the appropriateness of the trial court’s ruling on a pretrial motion to suppress. See State v. Henning, 975 S.W.2d 290, 299 (Tenn.1998) (holding that because the rules of appellate procedure “contemplate that allegations of error should be evaluated in light of the entire record[,]” an appellate court “may consider the proof adduced both at the suppression hearing and at trial”).
State v. Levitt, 73 S.W.3d 159, 169 (Tenn.Crim.App.2001).
The Fifth Amendment to the United States Constitution provides in part that “no person ... shall be compelled in any criminal case to be a witness against himself.” U.S. Const. amend. V. Similarly, Article I, section 9 of the Tennessee Constitution states that “in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.” Tenn. Const, art. I, § 9. However, an accused may waive this right against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). In Miranda, the United States Supreme Court held that a suspect must be warned prior to any questioning that he has the right to remain silent; that anything he says can be used against him in a court of law; that he has the right to the presence of an attorney; and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. 384 U.S. at 479, 86 S.Ct. 1602. The Supreme Court held that a suspect may knowingly and intelligently waive the right against self-incrimination only after being apprised of these rights. Id. Accordingly, for a waiver of the right against self-incrimination to be held constitutional, the accused must make an intelligent, knowing, and voluntary waiver of the rights afforded by Miranda. Id. at 444, 86 S.Ct. 1602. A court may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver. State v. Stephenson, 878 S.W.2d 530, 545 (Tenn.1994).
The United States Supreme Court has interpreted the Fifth Amendment in part to require that an incriminating statement or confession be freely and voluntarily given in order to be admissible. Bram v. United States, 168 U.S. 532, 542-43, 18 S.Ct. 183, 42 L.Ed. 568 (1897). This even applies to statements obtained after the proper Miranda warnings • have been issued. See State v. Kelly, 603 S.W.2d 726 (Tenn.1980). Statements and confessions not made as a result of custodial interrogations must also be voluntary to be admissible. See Arizona v. Fulminante, 499 U.S. 279, 286-88, 111 S.Ct. 1246, 1252-53, 113 L.Ed.2d 302 (1991). It must not be extracted by “any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.” Bram, 168 at 542^43, 18 S.Ct. at 187 (citation omitted). Moreover, due process requires that confessions tendered in response to either physical or psychological coercion be suppressed. Rogers v. Richmond, 365 U.S. 534, 540-41, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961); Kelly, 603 S.W.2d at 728-29. This has evolved into the “totality of circumstances” test to determine whether a confession is voluntary. Fulminante, 499 U.S. at 285-87, 111 S.Ct. at 1251-52; State v. Crump, 834 S.W.2d 265, 271 (Tenn.), cert. denied, 506 U.S. 905, 113 S.Ct. 298, 121 L.Ed.2d 221 (1992).
*249 The voluntariness test under the Tennessee Constitution has been held to be more protective of individual rights than the test under the United States Constitution. See Stephenson, 878 S.W.2d at 544. For the relinquishment of rights to be effective, the defendant must have personal awareness of both the nature of the right and the consequences of abandoning his rights. See id. at 544-45. Additionally, his statements cannot be the result of intimidation, coercion or deception. Id. at 544. In determining whether the statements were voluntary, the reviewing court looks at the totality of the circumstances surrounding the relinquishment of the right. Id. at 545.
The trial court found that the statements were made voluntarily. We have studied the evidence, and considering the totality of the circumstances, we cannot conclude that the trial court erred by denying the defendant’s motion to suppress on this issue. Again, the court’s determination that the statements were given knowingly and voluntarily is binding upon the appellate courts unless the defendant establishes that the evidence in the record preponderates against the trial court’s ruling. Henning, 975 S.W.2d at 299. In the instant case, the defendant asserts that “coercive police tactics” combined with his mental disease/defect rendered his confession/statements involuntary. The record reveals that the defendant was properly advised of his rights under Miranda and that the defendant indicated that he understood those rights. When the volun-tariness of a statement given to police is challenged based on the defendant’s competency to waive the rights provided by Miranda⅛ the determinative issue is “whether the defendant had the capacity in the first place to form a will of his own and to reject the will of others.” State v. Benton, 759 S.W.2d 427, 431 (Tenn.Crim.App.1988). The defendant presented no evidence of his mental condition at the motion to suppress. Notwithstanding, Dr. Caruso did testify at the subsequent trial regarding the defendant’s mental condition. Dr. Caruso conceded that the defendant was competent to stand trial and that a defense of insanity could not be supported in this case. He further admitted that “[he] didn’t feel that there was anything here that prevented Mr. Thacker from forming the mens rea for the alleged offenses.” In other words, the defendant “knew what the expected outcome of a murder was;” “[h]e was able to form a motive for that murder,” and “[h]e was able to understand that that murder was wrong and against the law.” Although the defendant was diagnosed as suffering from bipolar disorder, we cannot rationally conclude that the defendant was incapable of understanding his rights and providing a voluntary statement. Moreover, from the proof at the suppression hearing, we would be constrained to conclude that coercive police tactics were not employed. We have reviewed the record and find that the evidence does not preponderate against the trial court’s ruling. See Henning, 975 S.W.2d at 299. Thus, the defendant is not entitled to relief on this issue.
[Deleted: IX. LIMITATION ON MITIGATING EVIDENCE]
[Deleted: X. PROSECUTORIAL MISCONDUCT OF PRIOR BAD ACTS EVIDENCE]
[Deleted: XI. LIMITATION ON TESTIMONY OF DEFENDANT’S MENTAL CONDITION]
XII. STATE’S ARGUMENT REGARDING LIFE WITHOUT PAROLE
The defendant asserts that the prosecutor, on more than one occasion, made an *250 incorrect statement of the law to the jury. Specifically, he contends that the prosecutor repeatedly told the jurors that the mitigating factors have to outweigh the aggravating factors beyond a reasonable doubt in order to impose a sentence of life without the possibility of parole. During opening argument at the sentencing phase, the prosecutor remarked:
[A]t the end, you’re going to be asked to make a decision. The judge is going to instruct you that if you find that there are at least one aggravating circumstance and that there are no mitigating circumstances, you have to impose the death penalty. If you find that there are aggravating circumstances and that there are mitigating circumstances and that the aggravating circumstances outweighs, beyond a reasonable doubt, that mitigating circumstance, you impose the death penalty. If you find that those mitigating circumstances do outweigh that aggravator, but there is an aggravator there, beyond a reasonable doubt, but these mitigators outweigh it beyond a reasonable doubt, you impose life without parole. If you find that there are no aggravating circumstances at all, you impose a sentence of life in prison.
Later, during closing argument, the prosecutor stated:
[Rjemember the taker and the giver? Is that mitigating circumstance beyond a reasonable doubt greater than those aggravators? No. Your only choice in this case, with those two aggravators, and if you find a mitigator, but a miti-gator that does not outweigh those ag-gravators beyond a reasonable doubt, is to impose the death penalty.
And, again, in rebuttal closing:
[W]hat you’ve got to look at are those aggravators and if you feel there are mitigators there and if you feel that those mitigators outweigh those aggra-vators.
[[Image here]]
You have to find not only that there’s mitigating factors to not impose the death penalty, you’ve got to find that those mitigators outweigh that aggravator. The proof is, beyond a reasonable doubt, they don’t.
At the close of argument, defense counsel requested a curative instruction from the court relating to the erroneous statement of law made by the State. The trial court denied the request, stating that any error was cured by the jury charge, which will advise the jury as to the applicable law.
As asserted by the State, the defendant failed to make a contemporaneous objection to the prosecutor’s comments. Failure to object to a prosecutor’s alleged misconduct during closing argument waives later complaint. State v. Little, 854 S.W.2d 643, 651 (Tenn.Crim.App.1992). The failure to object to the prosecutor’s statements results in waiver on appeal. State v. Thornton, 10 S.W.3d 229, 234 (Tenn.Crim.App.1999) (citing Tenn. R.App. P. 36(a)).
Notwithstanding waiver, we note that Tennessee Code Annotated section 39-13-204, provides, in relevant part:
If the jury unanimously determines that no statutory aggravating circumstance has been proven by the state beyond a reasonable doubt, the sentence shall be imprisonment for life....
[[Image here]]
If the jury unanimously determines that a statutory aggravating circumstance or circumstances have been proven by the state beyond a reasonable doubt, but that such circumstance or circumstances have not been proven by the state to outweigh any mitigating circumstance or circumstances beyond a *251 reasonable doubt, the jury shall, in its considered discretion, sentence the defendant either to imprisonment for life without possibility of parole or imprisonment for life. The trial judge shall instruct the jury that, in choosing between the sentences of imprisonment for life without possibility of parole and imprisonment for life, the jury shall weigh and consider the statutory aggravating circumstance or circumstances proven by the state beyond a reasonable doubt and any mitigating circumstance or circumstances ....
[[Image here]]
If the jury unanimously determines that:
(A) At least one (1) statutory aggravating circumstance or several statutory aggravating circumstances have been proven by the state beyond a reasonable doubt; and
(B) Such circumstance or circumstances have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt; then the sentence shall be death.
Tenn.Code Ann. § 39 — 13—204(f)(1), (2), (g)(1). The trial court instructed the jury in accordance with the statute. The jury is presumed to follow the instructions of the trial court. State v. Walker, 910 S.W.2d 881, 397 (Tenn.1995), cert. denied, 519 U.S. 826, 117 S.Ct. 88, 136 L.Ed.2d 45 (1996). Moreover, from the context of the prosecutor’s comments, one can reasonably infer that the prosecutor’s intent was not to misinform the jurors but merely to emphasize the proof needed to impose a sentence of death, i.e., aggravating circumstances must outweigh mitigating circumstances. We cannot conclude that the improper argument by the State affected the verdict to the defendant’s prejudice. This claim is without merit.
[Deleted: XIII. LIMITATION OF DEFENSE TO STATUTORY MITIGATORS]
XIV. VICTIM IMPACT TESTIMONY
At the sentencing hearing, the State presented the testimony of Elizabeth Patterson, the wife of the victim. Elizabeth Patterson stated that she and the victim had been married for thirty-five years at the time of his death. The couple had three grown children. Mrs. Patterson related that her husband was her sole source of financial support prior to his murder. Since his death, Mrs. Patterson has had no income, and she had to borrow money to pay for their gravesites. She further explained that she was forced to borrow money until she received the insurance proceeds. Emotionally, Mrs. Patterson stated, “I lost my best friend and companion. And I can’t sleep at night in my bed. I sleep on my couch.” Mrs. Patterson described her husband as “a good man. He was a good Christian man. He would help anybody out.” She proceeded to describe incidents of where her husband would tow people for free, specifically recalling an incident involving an elderly couple stranded on 1-55.
The defendant challenges admission of this victim impact evidence on grounds that (1) the testimony of Elizabeth Patterson was unduly prejudicial and (2) that Mrs. Patterson’s testimony was admitted prior to evidence of one or more aggravating circumstances being established. The defendant also asserts that the prosecutor improperly argued victim impact during closing argument.
In State v. Nesbit, 978 S.W.2d 872, 889 (Tenn.1998), our supreme court held that “victim impact evidence and argument is [not] barred by the federal and state constitutions.” See State v. Austin, 87 S.W.3d 447, 463 (Tenn.2002); State v. Reid, 91 S.W.3d 247, 280 (Tenn.2002); see also *252 Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991) (holding that the Eighth Amendment erects no per se bar against the admission of victim impact evidence and prosecutorial argument); State v. Shepherd, 902 S.W.2d 895, 907 (Tenn.1995) (holding that victim impact evidence and prosecutorial argument not precluded by the Tennessee Constitution). Notwithstanding the holding that victim impact evidence is admissible under Tennessee’s death penalty sentencing scheme, the introduction of such evidence is not unrestricted. Nesbit, 978 S.W.2d at 891; see also Austin, 87 S.W.3d at 463.
Although victim impact evidence is admissible, such evidence generally should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual’s death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim’s immediate family.
Nesbit, 978 S.W.2d at 891; see also Reid, 91 S.W.3d at 280. Victim impact evidence may not be introduced if (1) it is so unduly prejudicial that it renders the trial fundamentally unfair; or (2) its probative value is substantially outweighed by its prejudicial impact. See Nesbit, 978 S.W.2d at 891; see also Austin, 87 S.W.3d at 463; State v. Morris, 24 S.W.3d 788, 813 (Tenn.2000) (appendix), cert. denied, 531 U.S. 1082, 121 S.Ct. 786, 148 L.Ed.2d 682 (2001). There is no bright-line test in determining the admissibility of victim impact evidence; thus, the admissibility must be determined on a case-by-case basis. Nesbit, 978 S.W.2d at 891. Mrs. Patterson testified regarding her marriage to the victim, her financial dependence upon him, the emotional impact of his death upon her, and what type of person the victim was. This is the type of testimony contemplated by Nesbit. Accordingly, Mrs. Patterson’s testimony was not unduly prejudicial.
To enable the trial court to supervise the admission of victim impact testimony, our supreme court has established certain procedural guidelines which must be followed before victim impact evidence may be admitted by the trial court. First, the State must notify the trial court of its intent to produce victim impact evidence. Nesbit, 978 S.W.2d at 891; Austin, 87 S.W.3d at 463. Second, upon receiving the State’s notification, the trial court must hold a hearing outside the presence of the jury to determine the admissibility of the evidence. Nesbit, 978 S.W.2d at 891; Austin, 87 S.W.3d at 463. Finally, the trial court should not permit introduction of such evidence until the court determines that evidence of one or more aggravators is already present in the record. Nesbit, 978 S.W.2d at 891; Austin, 87 S.W.3d at 463. Although the admission of unduly prejudicial victim impact evidence may implicate due process concerns, the procedure established in Nesbit is not constitutionally mandated. Austin, 87 S.W.3d at 463.
In the present case, the State notified the trial court of its intent to introduce victim impact evidence, and the trial court conducted a jury-out hearing to determine the admissibility of the evidence. However, the trial court failed to make a finding that proof of an aggravating circumstance existed in the record. The requirement that proof exists in the record of an aggravating circumstance before the presentation of victim impact evidence lessens the risk that the admission of unduly prejudicial victim impact evidence will render the trial fundamentally unfair. Austin, 87 *253 S.W.3d at 464-65. Although the trial court failed to specifically find that proof existed in the record of an aggravating circumstance, Mrs. Patterson was the State’s final witness to testify at the sentencing hearing. Accordingly, the proof of an aggravating circumstance preceded her testimony. The failure of the trial court to specifically make this finding on the record is harmless. Moreover, the defendant’s argument that Mrs. Patterson was the first witness at the trial to testify and, therefore, no proof of an aggravator existed is without merit. Mrs. Patterson’s testimony during the guilt phase is not “victim impact testimony.”
Finally, the defendant asserts that the prosecutor engaged in “inflammatory rhetoric” during his closing argument at the sentencing phase. He argues that such “inflammatory rhetoric” “diverts the jury’s attention from its proper role or invites an irrational, purely emotional response to the evidence” and is not permissible and “should not be tolerated.”
The prosecutor began closing argument at the sentencing phase stating:
Ladies and Gentlemen, as I lay in bed last night with my wife of twenty-five years, I though about Liz Patterson. I thought about what she testified to, that she doesn’t sleep in her bed anymore. She sleeps on the couch, because her husband of all those years is gone. I’m sad, and I felt sorry for Liz Patterson.
This was the only reference to Mrs. Patterson’s testimony in approximately eight pages of closing argument made by the prosecutor. Initially, this Court acknowledges that the defendant failed to contemporaneously object to the prosecutor’s statement. The defendant’s failure to object to these comments constitutes waiver on appeal. See State v. Thornton, 10 S.W.3d 229, 234 (Tenn.Crim.App.1999) (citing Tenn. R.App. P. 36(a)); State v. Green, 947 S.W.2d 186, 188 (Tenn.Crim.App.1997); State v. Little, 854 S.W.2d 643, 651 (Tenn.Crim.App.1992) (failure to object to prosecutor’s alleged misconduct during closing argument waives later complaint).
Notwithstanding waiver, while victim impact argument by the prosecution about the evidence is permissible, restraint should be exercised. This Court has consistently cautioned the State against engaging in victim impact argument which is little more than an appeal to the emotions of the jurors, as such argument may be unduly prejudicial. Nesbit, 978 S.W.2d at 891; State v. Shepherd, 902 S.W.2d 895, 907 (Tenn.1995) (“We caution the State to utilize such arguments advisedly.”); State v. Bigbee, 885 S.W.2d 797, 808 (Tenn.1994) (“[T]he State may risk reversal by engaging in argument which appeals to the emotions and sympathies of the jury.”). Indeed, prosecuting attorneys must remember that jurors are to base their decision upon a reasoned moral response to the evidence. See California v. Brown, 479 U.S. 538, 542-43, 107 S.Ct. 837, 839-40, 93 L.Ed.2d 934 (1987). The jury should not be given the impression that emotion may reign over reason. In each case, the trial court must strike a careful balance. Nesbit, 978 S.W.2d at 892. Argument on relevant, though emotional, considerations is permissible, but inflammatory rhetoric that diverts the jury’s attention from its proper role or invites an irrational, purely emotional response to the evidence is not permissible and should not be tolerated by the trial court. Id. We cannot conclude that the brief statement made by the prosecutor constituted improper “inflammatory rhetoric.” The statement was a brief reflection on the testimony of Mrs. Patterson and how her life has changed since her husband’s murder. Although the statement may be considered emotional, we conclude that the *254 statement was within the realm of acceptable argument.
Moreover, the jurors were properly instructed by the trial court regarding the function of victim impact evidence and that they were to apply the law as provided by the court. The jury is presumed to follow the instructions of the court. See State v. Walker, 910 S.W.2d 381, 397 (Tenn.1995), cert. Denied, 519 U.S. 826, 117 S.Ct. 88, 136 L.Ed.2d 45 (1996). With consideration of this mischaracterization of the function of victim impact testimony, the curative measure of the trial court, and the strength of the aggravating circumstances proven by the State, we conclude this issue is without merit.
[Deleted: XV. AGGRAVATING CIRCUMSTANCE (i)(6) ]
XVI. CONSTITUTIONALITY OF TENNESSEE DEATH PENALTY STATUTES
The defendant raises numerous challenges to the constitutionality of Tennessee’s death penalty provisions. Included within his challenge that the Tennessee death penalty statutes violate the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, and Article I, sections 8, 9,16, and 17, and Article II, section 2 of the Tennessee Constitution are the following:
1.The requirement in Tennessee Code Annotated section 39 — 13—204(f) and (g) that the additional element of “aggravating circumstance” be proven beyond a reasonable doubt in a second proceeding after a conviction of first degree murder has in effect given the defendant a life sentence renders the statute unconstitutional as violating protections against double jeopardy.
This argument has been rejected by our supreme court. See Houston v. State, 593 S.W.2d 267, 276 (Tenn.1980), overruled on other grounds by State v. Brown, 836 S.W.2d 530 (Tenn.1992).
2. Tennessee Code Annotated section 39-13-204(c) permits the introduction of hearsay in the second stage of proceedings as evidence in the State’s proof of aggravation or rebuttal of mitigation and thus violates the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution.
As our supreme court has noted many times, hearsay is admissible in first degree murder sentencing hearings. See Austin, 87 S.W.3d at 459; State v. Odom, 928 S.W.2d 18, 28 (Tenn.1996).
3. The sentencing system provided in Tennessee Code Annotated section 39-13-204 is so vague, broad, and internally contradictory that it results in the arbitrary and capricious imposition of the death penalty in Tennessee in violation of the United States and Tennessee Constitutions.
This argument was rejected in State v. Johnson, 762 S.W.2d 110, 119 (Tenn.1988), cert denied, 489 U.S. 1091, 109 S.Ct. 1559, 103 L.Ed.2d 862 (1989).
4. The infliction of death as a punishment for a conviction for murder is without justification and so severe as to constitute “cruel and unusual punishment” prohibited by the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Tennessee Constitution.
The defendant’s argument that the death penalty by any means constitutes cruel and unusual punishment in violation of the state and federal constitutions has been repeatedly rejected by our appellate courts. See State v. Keen, 31 S.W.3d 196, 233 (Tenn.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); *255 State v. Pike, 978 S.W.2d 904, 925 (Tenn.1998) cert. denied, 526 U.S. 1147, 119 S.Ct. 2025, 143 L.Ed.2d 1036 (1999); State v. Nesbit, 978 S.W.2d 872, 902-03 (Tenn.1998) cert. denied, 526 U.S. 1052, 119 S.Ct. 1359, 143 L.Ed.2d 520 (1999); State v. Vann, 976 S.W.2d 93, 118 (Tenn.1998), cert denied, 526 U.S. 1071, 119 S.Ct. 1467, 143 L.Ed.2d 551 (1999); State v. Blanton, 975 S.W.2d 269, 286 (Tenn.1998), cert. denied, 525 U.S. 1180, 119 S.Ct. 1118, 143 L.Ed.2d 113 (1999); State v. Cribbs, 967 S.W.2d 773, 796 (Tenn.) cert. denied, 525 U.S. 932, 119 S.Ct. 343, 142 L.Ed.2d 283 (1998); State v. Cauthern, 967 S.W.2d 726, 751 (Tenn.) cert. denied, 525 U.S. 967, 119 S.Ct. 414, 142 L.Ed.2d 336 (1998).
5. The death penalty statute fails to sufficiently narrow the population of defendants convicted of first degree murder, who are eligible for a sentence of death in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 & 16 of the Tennessee Constitution.
Although the defendant fails to assert what aggravating circumstances fail to narrow the class of death-eligible defendants, with respect to the (i)(6) and (i)(7) aggravators applicable in the case sub ju-dice, our supreme court has rejected such a claim on previous occasions. See Vann, 976 S.W.2d at 117-118 (appendix); State v. Keen, 926 S.W.2d 727, 742 (Tenn.1994).
6. The death penalty statute fails to sufficiently limit the exercise of the jury’s discretion because, once the jury finds aggravation, it can impose the sentence of death no matter what mitigation is shown, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 & 16 of the Tennessee Constitution.
This argument was rejected by State v. Smith, 857 S.W.2d 1, 21-22 (Tenn.1993); see also Franklin v. Lynaugh, 487 U.S. 164, 178-80, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988); State v. Hurley, 876 S.W.2d 57, 69 (Tenn.1993).
7. The death penalty statute fails to sufficiently limit the exercise of the jury’s discretion by mandating the jury to impose a sentence of death if it finds the aggravating circumstances outweigh the mitigating circumstances in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 & 16 of the Tennessee Constitution.
This argument has previously been considered and specifically rejected by the Tennessee Supreme Court. See Smith, 857 S.W.2d at 22 (holding that Tennessee’s death penalty statutes “do[] not in any way constitutionally deprive the sentencer of the discretion mandated by the individualized sentence requirements of the constitution”).
8. The death penalty statutes fail to require the jury to make the ultimate determination that death is appropriate in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 & 16 of the Tennessee Constitution.
This argument has likewise been rejected by the supreme court. See State v. Hall, 958 S.W.2d 679, 718 (Tenn.1997); State v. Brimmer; 876 S.W.2d 75, 87 (Tenn.1994); Smith, 857 S.W.2d at 22.
9. The death penalty statutes fail to inform the jury of its ability to impose a life sentence out of mercy in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 & 16 of the Tennessee Constitution.
*256 Our appellate courts have consistently rejected the argument that the “mercy instruction” is required at a capital sentencing hearing. See Cauthern, 967 S.W.2d at 749; State v. Bigbee, 885 S.W.2d 797, 813-14 (Tenn.1994); State v. Cazes, 875 S.W.2d 253, 269 n. 6 (Tenn.1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995).
10. The death penalty statutes provide no requirement that the jury make findings of fact as to the presence or absence of mitigating circumstances, thereby preventing effective review on appeal in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 & 16 of the Tennessee Constitution.
This claim was rejected in Cazes, 875 S.W.2d at 268-69.
11. The death penalty statutes prohibit the jury from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 8, 9, 10, and 16 of the Tennessee Constitution.
Our supreme court has repeatedly rejected this argument. See Cribbs, 967 S.W.2d at 796 (appendix); Hall, 958 S.W.2d at 718; Brimmer, 876 S.W.2d at 87.
12. The death penalty statute allows the State to make final closing arguments to the jury in the penalty phase in violation- of the defendant’s right to due process of law and effective assistance of counsel as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 9 of the Tennessee Constitution.
This claim has been rejected by our supreme court. Brimmer, 876 S.W.2d at 87 n. 5; State v. Caughron, 855 S.W.2d 526, 542 (Tenn.1993).
[Deleted: XVII. REVIEW PURSUANT TO TENNESSEE CODE ANNOTATED SECTION 39-13-206(c) ]
[Deleted: Conclusion]

. "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument.” Tenn. Sup.Ct. R. 12.2.

. The convictions were subsequently merged into a single conviction.

. When the jury returns guilty verdicts as to alternative counts of first degree murder, the two verdicts merge into one count of first degree murder. See Carter v. State, 958 S.W.2d 620, 624-25 (Tenn.1997). A general verdict of guilty is sustainable if any one count in the indictment is supported by proof. See Tenn.Code Ann. § 40-18-111 (1997). Thus, proof of either premeditated murder or felony murder is sufficient to sustain the conviction.

. The motion to suppress filed by defense counsel was generic in nature and also challenged any evidence seized as the result of any searches. As the defendant limits his argument on appeal to the suppression of his confession, we will do the same.