IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 3, 2021

## STATE OF TENNESSEE v. ANTOINE ADAMS

**Appeal from the Criminal Court for Shelby County**
**No. 17-03641     J. Robert Carter, Jr., Judge**

_____

### No. W2020-00566-CCA-R3-CD

_____

Aggrieved of his Shelby County Criminal Court Jury convictions of first degree murder and especially aggravated robbery, the defendant, Antoine Adams, appeals, challenging the sufficiency of the convicting evidence and the consecutive alignment of his sentences. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER, and J. ROSS DYER, JJ., joined.

Charles W. Gilchrist, Jr., Memphis, Tennessee, for the appellant, Antoine Adams.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Brad Reasonover and Matt McLeod, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Shelby County Grand Jury charged the defendant and the co-defendant, Octavious Bland, with one count of first degree premeditated murder, one count of felony murder in the perpetration of attempted robbery, and one count of especially aggravated robbery related to the February 6, 2017 death of the victim, Marquis Bell.

At the January 7, 2020 trial, Lamarcus Reed testified that on February 6, 2017, he went to the Pepper Tree Store[1] adjacent to the Pepper Tree Apartments with the

_____

[1]     Some witnesses identified the store as the Pepper Tree Store while others identified it as the T and A Market.  For the sake of clarity, we will identify it as the Pepper Tree Store.

victim, who was also known as "Lil Boosie" and who was Mr. Reed's cousin, Rachel Allen, and Shadarra Bowles. Mr. Reed recalled that, as the group walked to the store from his residence in the Pepper Tree Apartments, "everybody was saying that they was talking about robbing Boosie." He explained that some women told the victim that "they was talking about robbing him for a gun." Mr. Reed said that the co-defendant, whom Mr. Reed knew as "Kitchen," "confronted" the victim "about it, and they had words." The victim and the co-defendant "was front to front with each other" arguing when the co-defendant "grabbed the gun" from the victim. The co-defendant then "fired at [the victim], and then that's when [the defendant] came and shot." Mr. Reed said that the defendant, whom Mr. Reed knew as "Family," was not involved in the argument between the victim and the co-defendant but nevertheless fired at the victim after the co-defendant did so.

Mr. Reed testified that, after shooting the victim, the defendant and co-defendant "ran off." As the two men ran by, Mr. Reed heard the defendant say, "I just killed him on camera. That's all I wanted was the gun." The defendant also said that he "ought to shoot him with his gun, and I was like, naw, brother leave him alone." The defendant said, "that n**** still alive. I ought to shoot him again with his gun. I was like, naw, bro, keep going. He dead." Mr. Reed identified the defendant and co-defendant from photographic lineups later that same day.

The video surveillance recording from the Pepper Tree Store, which was exhibited to Mr. Reed's testimony, captured the shooting. Mr. Reed identified himself, the victim, the defendant, the co-defendant, Ms. Allen, and Ms. Bowles in the video recording.

During cross-examination, Mr. Reed acknowledged that the defendant and the victim did not exchange words. Mr. Reed said that he backed away from the co-defendant and the victim as their exchange became heated "because both of them had they gun" and were ready to shoot one another. The co-defendant outdrew the victim and fired four shots. After the co-defendant shot at the victim, the defendant came up and shot the victim.

During redirect examination, Mr. Reed said that the victim never actually attempted to pull his own gun from his jacket. The defendant drew his own weapon before the shooting began.

Rachel Allen, Mr. Reed's girlfriend and the mother of his children, testified that on February 6, 2017, she was with Mr. Reed and the victim in the parking lot of the Pepper Tree Store when she saw "Murder and Family" shoot the victim, whom she knew as "Lil Boosie." She identified the defendant as the person whom she knew as "Family" and said that "Murder" was also known as "Kitchen." Ms. Allen recalled that the victim exchanged words with the co-defendant and that she saw the co-defendant "tucking his

gun, and he was saying he was getting ready to try a n****." She said that she "knew what he was talking about," explaining, "Well, due to what Boosie had said, I guess he was just reacting off that." Ms. Allen tried "to diffuse it. So I was telling him just leave the situation alone, but he . . . kept walking passed [sic] me." She said that the men argued but that she could not hear what they were saying. Eventually, she saw the co-defendant "reach[] for Boosie's gun and took it off his hip." At that point, she turned and started walking toward the Pepper Tree Apartments but "didn't walk off far" when she heard "[p]robably more than 10" gunshots. The defendant and co-defendant then ran past Ms. Allen saying "like, yeah, bitch a** n****, we just did a murder on camera." The co-defendant had two guns and the defendant had one.

Ms. Allen walked over to where the victim lay on the ground, "still breathing." The defendant walked back by them and said "damn, that n**** still alive. I need to shoot him again." Mr. Reed told the defendant to "leave him alone." Ms. Allen spoke with detectives later that same day and identified the defendant from a photographic array.

Shadarra Bowles, who described the victim as her best friend, testified that on February 6, 2017, she and the victim were "[j]ust chilling" with Mr. Reed and Ms. Allen when they decided to walk to the Pepper Tree Store. She said that she saw the two men who shot the victim but that she did not recognize either man. She provided "a full description" of what the men were wearing. She was unable to identify either man from a photographic array but was able to identify the defendant in court as one of the men who shot the victim. She said that, after the shooting, she heard the defendant say, "Where his gun at now?" She also heard the defendant say "he ought to put one more in his head."

Memphis Police Department ("MPD") Sergeant William Carver testified that he responded to a call of a shooting at the Pepper Tree Store on February 6, 2017. When he arrived, he observed the victim lying in the parking lot "cradled in the arms of" Mr. Reed, "and he appeared to be suffering from gunshot wounds." The victim was still alive, so Sergeant Carver called for an ambulance, which arrived approximately 10 minutes later.

MPD Crime Scene Investigation Officer Marcus Mosby photographed the scene and collected several items of evidence, including bloody clothing and two nine-millimeter shell casings.

Doctor Erica Curry performed the autopsy of the victim on February 7, 2017. She testified that one gunshot "entered on the outside of his left eyebrow, and then it travelled . . . underneath the skin and soft tissue and exited on the inside of his left eyebrow." Another gunshot "entered on the left side of his face" and then travelled "into his head through a bone on the front and the side and actually went into his brain on the

-3-

left side. And I recovered a bullet from near the back part of his brain on the left side." A third gunshot entered the right side of the victim's face and "also went through into his head through a bone on the right side and then went through two parts of his brain . . . and then actually travelled through the . . . bone of his head and went behind the bone of his right eye where I got a bullet." The victim also suffered gunshot wounds to his back, arms, hip, and legs. Doctor Curry recovered bullets from "the lower spine" and the "inside of his abdominal or stomach cavity." She identified the cause of the victim's death as multiple gunshot wounds.

The State rested, and, following a full *Momon* colloquy, the defendant elected not to testify and chose to present no other proof.

Based upon this evidence, the jury convicted the defendant as charged. The trial court merged the first degree murder convictions into a single conviction and imposed a sentence of life imprisonment for that conviction. Following a sentencing hearing, the trial court imposed a sentence of 30 years for the conviction of especially aggravated robbery to be served consecutively to the defendant's life sentence for a total effective sentence of life plus 30 years.

In this timely appeal, the defendant challenges the sufficiency of the convicting evidence and the imposition of consecutive sentences.

*I. Sufficiency*

The defendant challenges the sufficiency of the convicting evidence, arguing that the State failed to establish that the defendant acted with premeditation or that he took anything from the victim after shooting him. The State asserts that the evidence was sufficient.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another" or "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." T.C.A. § 39-13-202(a)(1)(2). "Especially aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon; and [w]here the victim suffers serious bodily injury." *Id.* § 39-13-403(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a).

As used in Code section 39-13-202,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007). Thus, when evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g.*, *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

Before a killing will "fall within the definition of felony murder, [it] must have been 'done in pursuance of the unlawful act, and not collateral to it.'" *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Rice*, 184 S.W.3d 646, 663 (Tenn. 2006) (quoting *Farmer v. State*, 296 S.W.2d 879, 883 (1956))). "In other words, 'The killing must have had an intimate relation and close connection with the felony . . . , and not be separate, distinct, and independent from it [.]'" *Farmer*, 296 S.W.2d at 883 (quoting *Wharton on Homicide*, § 126 (3rd ed.)); *see also, e.g.*, *Banks*, 271 S.W.3d at 140; *State v.*

-5-

*Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005). To satisfy the requirement of "an intimate relation and close connection," "the killing 'may precede, coincide with, or follow the felony and still be considered as occurring "in the perpetration of" the felony offense, so long as there is a connection in time, place, and continuity of action'" *Thacker*, 164 S.W.3d at 223 (quoting *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999)).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-12-401. "[C]riminal responsibility is not a separate, distinct crime" but is instead "a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). Criminal responsibility "is a codification of the common-law theories of aiding and abetting and accessories before the fact." *Id.* at 171 (citing *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997)). "No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible." *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Criminal responsibility "requires that a defendant act with a culpable mental state, [i.e.], the 'intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense.'" *Carson*, 950 S.W.2d at 954 (quoting T.C.A. § 39-11-402(2) (1991)). The "natural and probable consequences rule," which "survived the codification of the common law into the criminal responsibility statutes," "extends the scope of criminal liability to the target crime intended by a defendant as well as to other crimes committed by a confederate that were the natural and probable consequences of the commission of the original crime." *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000) (citing *Carson*, 950 S.W.2d at 954-55 (Tenn. 1997)).

The evidence adduced at trial established that the victim and the co-defendant argued before the co-defendant took the victim's gun. The co-defendant and the defendant then both shot the victim more than one time before walking away with the victim's gun. After the shooting, the defendant noticed that the victim was not yet dead and was overheard to say that he should shoot the victim again. The defendant's shooting the unarmed victim after he had already been shot by the co-defendant and his calm and "cocky" demeanor immediately after the shooting support a conclusion that he acted with premeditation. Although the defendant did not take anything from the victim, the evidence clearly established that he was criminally responsible for the co-defendant's taking the victim's gun. This evidence was sufficient to support each of the defendant's convictions.

## II. Sentencing

The defendant contends that the trial court erred by ordering that he serve the 30-year sentence imposed for his especially aggravated robbery conviction consecutively

to the life sentence imposed for his conviction of first degree murder, arguing that the trial court abused its discretion because the defendant "has a positive history of completing programs while incarcerated for previous sentences."  The State asserts that the trial court did not err.

The presentence report, which was exhibited to the sentencing hearing, established that the 30-year-old defendant had a prior conviction for the possession of Schedule I drugs, and certified copies of judgments exhibited to the hearing established that he had three prior convictions for the facilitation of aggravated robbery.  At the time of the sentencing hearing, the defendant also had charges of first degree murder and an escape pending in Marshall County and a separate charge of first degree murder pending in Shelby County.

In ordering consecutive alignment of the sentences, the trial court found that the defendant had an extensive criminal history of committing violent crimes and that he was a dangerous offender whose "behavior indicates little or no regard for human life."  The court concluded that the aggregate sentence of life plus 30 years "reasonably relates to the . . . offenses for which he has been convicted."

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act."  *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed."  T.C.A. § 40-35-103(5).  Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'"  *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)).  Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."  *Id.* at 709.

The standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)."  *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).  In *State v. Wilkerson*, the supreme court held that the trial court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect

the public from further criminal conduct before utilizing the "dangerous offender" category to impose consecutive sentencing, *see State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995), and "[t]he adoption of the abuse of discretion standard with the presumption of reasonableness has not eliminated this requirement," *Pollard*, 432 S.W.3d at 863.

In our view, the record supports the sentencing decision of the trial court. The defendant had previous convictions of facilitation of aggravated robbery and drug possession. The defendant shot the unarmed victim multiple times in broad daylight on camera and was completely calm afterwards. The trial court made the proper findings to support its conclusion that the defendant was a dangerous offender. Indeed, the defendant does not challenge either the trial court's finding that he had an extensive criminal history or that he was a dangerous offender and argues only that he had achieved success at "completing programs while incarcerated."

*Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE